No. 19-5340

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

**TERRANCE MILES**,

*Appellant*,

v.

**SCOTT JORDAN,**

*Appellee.*

_____

On Appeal from the United States District Court
for the Western District of Kentucky,
No. 3:17-cv-00558-JHM-RSE

_____

**BRIEF OF APPELLANT TERRANCE MILES**

_____

Louis K. Fisher
Kathryn Kimball Mizelle
   *Counsel of Record*
Genna L. Sinel
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3435
kmizelle@jonesday.com

*Counsel for Appellant*
   *Terrance Miles*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................. vi

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ................................................................... 1

INTRODUCTION ................................................................................. 2

STATEMENT OF THE CASE ............................................................. 4

    A.    Factual Background........................................................... 4

    B.    Pretrial Delay.................................................................... 5

    C.    Trial ................................................................................... 8

    D.    Direct Appeal .................................................................. 13

    E.    State-Court Habeas Proceedings .................................... 14

    F.    Federal Habeas Proceedings........................................... 17

SUMMARY OF ARGUMENT ........................................................... 19

STANDARD OF REVIEW ................................................................. 21

ARGUMENT ...................................................................................... 22

I.    THE KENTUCKY SUPREME COURT'S ADJUDICATION OF MILES'S SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW ................................... 22

    A.    The Kentucky Supreme Court failed to apply the clearly established legal standard and is owed no deference ......................... 25

    B.    Under the clearly established legal standard, Miles suffered a violation of his Sixth Amendment right to a speedy trial .............. 29

II.    THE KENTUCKY SUPREME COURT'S DETERMINATION THAT MILES WAS NOT PREJUDICED BY HIS COUNSEL'S FAILURE TO OBJECT TO INFLAMMATORY NICKNAMES AND EVIDENCE OF AN UNRELATED GUN WAS CONTRARY TO, AND AN UNREASONABLE APPLICATION OF, FEDERAL LAW ..................................................................... 36

    A.    The use of "Old Gangsta" and "Cat Daddy" caused Miles prejudice ................................................................. 37

# **TABLE OF CONTENTS**
## (continued)

**Page**

B.    The evidence of an unrelated gun caused Miles prejudice ...............45

III.   THE WARDEN VIOLATED FEDERAL RULE OF APPELLATE PROCEDURE 23(A) ........................................................................47

CONCLUSION ....................................................................51

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ...................53

CERTIFICATE OF SERVICE ..............................................54

DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS ................55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arrant v. Wainwright*,
    468 F.2d 677 (5th Cir. 1972) ...............................................................32

*Barker v. Wingo*,
    407 U.S. 514 (1972)....................................................................*passim*

*Brumfield v. Cain*,
    135 S. Ct. 2269 (2015)....................................................................22

*Cain v. Smith*,
    686 F.2d 374 (6th Cir. 1982) ......................................................7, 25

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)...........................................................................51

*Cohen v. United States*,
    593 F.2d 766 (6th Cir. 1979) ...........................................................50

*Doggett v. United States*,
    505 U.S. 647 (1992)....................................................................*passim*

*Edmonds v. Smith*,
    922 F.3d 737 (6th Cir. 2019) .............................................................6

*Harris v. Commonwealth*,
    384 S.W.3d 117 (Ky. 2012).............................................................46

*Jago v. U.S. Dist. Ct.*,
    570 F.2d 618 (6th Cir. 1978) ...........................................................48

*Kloper v. North Carolina*,
    386 U.S. 213 (1967)........................................................................23

*Kraus v. Taylor*,
    715 F.3d 589 (6th Cir. 2013) .............................................................6

*Major v. Commonwealth*,
    177 S.W.3d 700 (Ky. 2005).............................................................46

*Maples v. Stegall*,
    427 F.3d 1020 (6th Cir. 2005) ...............................................24, 35, 36

*Miles v. Commonwealth*,
    No. 2007-SC-000298-MR, 2009 WL 160435 (Ky. Jan. 22, 2009).....................4

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Porter v. McCollum*,
  558 U.S. 30 (2009)............................................................................41

*Redd v. Sowders*,
  809 F.2d 1266 (6th Cir. 1987) ...............................................32, 33, 34

*Rompilla v. Beard*,
  545 U.S. 374 (2005)..........................................................................22

*Rumsfeld v. Padilla*,
  542 U.S. 426 (2004)..........................................................................49

*Schultz v. United States*,
  373 F.2d 524 (5th Cir. 1967) ............................................................51

*Scott v. Houk*,
  760 F.3d 497 (6th Cir. 2014) ............................................................21

*Sears v. Upton*,
  561 U.S. 945 (2010).....................................................................*passim*

*Strickland v. Washington*,
  466 U.S. 668 (1984)...........................................................17, 37, 45, 46

*United States v. Brown*,
  169 F.3d 344 (6th Cir. 1999) ............................................................31

*United States v. Farmer*,
  583 F.3d 131 (2d. Cir. 2009) .........................................38, 39, 41, 45

*United States v. Ferreira*,
  665 F.3d 701 (6th Cir. 2011) .........................................24, 28, 30, 34

*United States v. Graham*,
  128 F.3d 372 (6th Cir. 1997) ...............................................26, 32, 34

*United States v. Ingram*,
  446 F.3d 1332 (11th Cir. 2006) .............................................26, 29

*United States v. Wilkerson*,
  456 F.2d 57 (6th Cir. 1972) ........................................................39, 40

*Williams v. Taylor*,
  529 U.S. 362 (2000)..........................................................................46

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const., Amendment VI ........................................................................23

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

28 U.S.C. § 2241 .......................................................................................50

28 U.S.C. § 2253 .........................................................................................1

28 U.S.C. § 2254 ..................................................................................*passim*

OTHER AUTHORITIES

Black's Law Dictionary (11th ed. 2019) ...................................................49

Fed. R. App. P. 23 ...............................................................................*passim*

Fed. R. Evid. 404 ......................................................................................39

Ky. R. Crim. Proc. 11.42 .........................................................................14

Ky. R. Crim. Proc. 9.24 ...........................................................................46

Ky. R. Evid. 404.......................................................................................39

Michael Waters, *What do you call this hat?* Atlas Obscura,
    Jul. 24, 2017...........................................................................................2

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Terrance Miles respectfully requests oral argument.  The district court granted Miles a certificate of appealability as to four claims based on errors that occurred in his state-court trial, which raise distinct legal issues as well as distinct factual issues regarding the Sixth Amendment right to a speedy trial and right to counsel as well as the appropriate level of deference owed the Kentucky state court adjudications under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2241 et seq.  This Court also ordered the parties to brief the novel issue concerning the improper custody transfer of Miles in violation of Federal Rule of Appellate Procedure 23(a).  Accordingly, oral argument would aid the Court in its analysis of this case.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Miles's habeas petition under 28 U.S.C. §§ 1331 and 2254. In a final judgment entered on March 14, 2019, the district court denied the petition and granted a certificate of appealability as to four claims. Order, R.65, PageID#1241; Judgment, R.66, PageID#1242. Miles filed a timely notice of appeal on April 3, 2019, R.70, PageID#1260, which this Court construed as a motion to expand the certificate of appealability and denied, Order at 1, *Miles v. Jordan*, No. 19-5340 (6th Cir. Nov. 5, 2019). This Court, however, granted Miles's motion for appointment of counsel and ordered the parties to brief the additional issue of his improper transfer in violation of Federal Rule of Appellate Procedure 23(a). *Id.* at 11. This Court has jurisdiction under 28 U.S.C. §§ 1291, 2253(a), and 2253(c)(1)(A).

## STATEMENT OF ISSUES

1.   Whether Miles is entitled to habeas relief for a violation of his Sixth Amendment right when he made at least eight requests for a speedy trial, the nearly two-year delay was solely attributable to the Commonwealth's gross negligence, and an eyewitness died in the interim.

2.   Whether Miles is entitled to habeas relief for a violation of his Sixth Amendment right when trial counsel was ineffective by failing to object to the prosecutor's repeated and inflammatory references to Miles as "Old Gangsta" and "Cat Daddy" during closing arguments.

3.    Whether Miles is entitled to habeas relief for a violation of his Sixth Amendment right when trial counsel was ineffective by failing to object to the introduction of a gun—wholly unrelated to the murder or other charges—found in Miles's residence.[1]

4.    Whether the Warden's unauthorized transfer of Miles violated Federal Rule of Appellate Procedure 23(a).

## **INTRODUCTION**

Miles was accused of fatally shooting a bouncer at a club based on the "identification" testimony that he had worn "dark clothing" and "maybe a toboggan [hat]," which "fit the description" of a person seen running through the club's parking lot after the shooting.[2] Police recovered a toboggan hat from the crime scene, but forensic testing showed that the DNA on the hat was not from Miles. Police also recovered a gun from Miles's residence, but ballistics testing confirmed it was not the murder weapon. Given that the toboggan hat and the gun contradicted the Commonwealth's theory, the prosecutor turned to improper propensity inferences. From his opening statement—where he told the jury Miles had a gun—to his closing arguments referring to Miles six times as "Cat Daddy," "Old Gangsta"

---

[1] The district court granted a certificate of appealability on a fourth issue concerning counsel's failure to object to hearsay testimony. Miles does not press this issue on appeal.

[2] In the American South, "'[t]oboggan' is one of a vast array of words used to describe a knit hat." *See* Michael Waters, *What do you call this hat?* Atlas Obscura, Jul. 24, 2017.

or both, the prosecutor invited the jury to convict Miles because he was a gang member with a gun.  Unfortunately, it worked.

Compounding the problem was the fact that the Commonwealth delayed trial for nearly two years.  For what reason?  Ostensibly to test the toboggan hat, which it considered "crucial evidence."  But it delayed that testing by not sending the hat to the lab for the first 9 months and then it sat untested at the lab for months longer.  When that evidence turned out to be exculpatory, the prosecutor told the jury he never believed it had anything to do with the case.  Meanwhile, Miles continued to ask the trial court for a speedy trial.  Not once or twice, but at least *eight* times.  None of his requests were granted.

After exhausting his direct appeal and post-conviction relief in state court, Miles filed a habeas petition in district court, arguing that his trial counsel was ineffective for failing to object to the prosecution's misconduct and that his Sixth Amendment right to a speedy trial was violated.  The district court denied his petition, but granted him a certificate of appealability.  This Court should reverse the judgment of the district court and remand to the district court with a direction to grant Miles habeas relief.

## STATEMENT OF THE CASE

### A.   Factual Background

In the early morning hours of February 27, 2005, Michael Teasley, a bouncer at a Louisville nightclub, was shot and killed in a crowded parking lot as he attempted to clear patrons from the area. *Miles v. Commonwealth*, No. 2007-SC-000298-MR, 2009 WL 160435, at *1 (Ky. Jan. 22, 2009); R.16-2, PageID#355-56.

Police identified Miles as a suspect based on an altercation he had with Teasley earlier in the evening after getting kicked out of the club. The police collected a toboggan hat and cell phone from the scene of the crime; they separately found a gun in Miles's home. *Id.* at PageID#356, R.16-3, PageID#532. Forensic testing later confirmed that DNA on the hat did not belong to Miles, and ballistics testing confirmed that the gun was not used in the shooting. *Id.*; Trial Transcript, 324:16-325:2, R.53-1 (A350-351).[3]

On March 5, 2005, Miles was indicted for murder, wanton endangerment, tampering with physical evidence, and being a persistent felony offender. Indictment, R.16-2, PageID#276-278.

---

[3] Per this Court's order, Doc. 27-2, the non-electronic video recordings of the trial and pretrial hearings that were filed in the district court have been transcribed in accordance with Circuit Rule 30(b)(5)(A). Pursuant to instructions of the clerk's office, citations include reference to the district court docket entry where the recordings were originally filed and the appendix pagination where the transcripts are located.

### B.    Pretrial Delay

The trial was not held until December *2006*, almost two years after the indictment.  Over the course of the intervening 21 months, Miles repeatedly—and vigorously—asserted his right to a speedy trial.  The prosecution, however, opposed Miles's request and instead sought three continuances to conduct the DNA test on the hat that was found at the scene of the crime.  R.16-2, PageID#358-59.  Despite the prosecutor's assertions that this evidence was "very substantial," Pretrial Hearing, Dec. 5, 2005, 2:22, R.21-1, (A9), the Commonwealth did not send the hat to the lab for testing for 9 months after collecting it and then it lingered at the lab for another year, R.16-2, PageID#357; Trial Transcript, 368:16-23, R.53-1 (A394). Ultimately, Miles's DNA did not match that found on the hat.

During this 21-month delay, Miles persistently asserted his right to a speedy trial.  In May 2005, the court scheduled trial to begin on December 13, 2005.  Docket Sheet, Jefferson County Circuit Court, No. 05-cr-740. [4]    Even before the

---

[4]    The state-court record that the Warden filed in district court as part of respondent's answer, as required under Rule 5 of the Rules Governing Habeas Proceedings, was incomplete.    R.16, R.17, R.18, R.53-1; *see* Order, R.7, PageID#214 (instructing respondent to file "portions of the state-court record pertinent to the issues raised in the petition and answer, including but not limited to exhibits, docket sheets, transcripts, and pleadings").  Among other materials, it failed to include a docket sheet indicating relevant dates, motions, and correspondence from Miles.    Miles supplemented the record with video recordings of pretrial hearings, R.21-1, PageID#794, as well as some documents, R.1.  Notably, he moved for production of the missing state-court records pursuant to 28 U.S.C. § 2254(f), R.31, PageID#1016, which respondent opposed.  The magistrate judge denied the

Commonwealth's first motion for a continuance, Miles filed a *pro se* letter to the court asserting his Sixth Amendment right and stating that "I'm adamant about having a Fast and Speedy Trial."  Letter Nov. 25, 2005 , R.1-3, PageID#125.  At a pretrial hearing on December 5, 2005, the prosecution told the court that it was seeking a continuance in order to receive the DNA results and that the lab has had the hat "for a number of months now."  Pretrial Hearing, Dec. 5, 2005, 3:15, R.21-1 (A10).  In reality, the prosecution had sent the hat for testing less than 30 days earlier—9 months after collecting it at the crime scene.  R.16-2, PageID#357; Trial Transcript, 368:16-23, R.53-1 (A394).  During this hearing, Miles interrupted his counsel to explain that the prosecution had the hat since February 2005 and that he viewed the Commonwealth's pending motion as "a stall tactic."  Pretrial Hearing, Dec. 5, 2005, 5:21-6:3, R.21-1 (A12-13).

---

motion, reasoning that the Warden's initial production was "comprehensive and responsive to the claims in Miles' petition," R.54, PageID#1084-1085.  This Court should therefore draw any inference based on evidentiary gaps in the state-court record in Miles's favor where the Warden refused to furnish the relevant documents.

Counsel obtained certain omitted documents directly from the Jefferson County Circuit Court—such as a docket sheet and motions related to the speedy trial claim—and has noted where relied upon in the brief.  However, because these and other related materials were not before the district court, if this Court concludes that they are necessary to adjudicate any claim, it should remand to the district court to review the full state-court record in the first instance.  *See, e.g.*, *Edmonds v. Smith*, 922 F.3d 737, 741 (6th Cir. 2019) (remanding for district court "to obtain the entire state court record and assess those claims on the merits"); *Kraus v. Taylor*, 715 F.3d 589, 595 (6th Cir. 2013).

At a hearing a week later, Miles's counsel filed a formal motion for speedy trial, but the court still granted the Commonwealth a continuance until April 2006. Pretrial Hearing, Dec. 13, 2005, 3:12-14, R.21-1 (A17).  At a hearing in March 2006, more than a year after the hat was recovered, the court inquired about the status of the DNA test and the prosecutor explained that "the lab had not even started testing the hat."  R.16-2, PageID#357-358.

The Commonwealth then sought a second continuance in April 2006.  Miles's counsel objected, stating that "there's been some unnecessary delay," "the defense is ready to go forward," and "[t]here is a speedy trial motion pending." Pretrial Hearing, Apr. 11, 2006, 4:8-10, R.21-1 (A22).  The court nevertheless granted the prosecution's second motion for a continuance and reset the trial date, this time for September 2006.  Docket Sheet, Jefferson County Circuit Court, No. 05-cr-740. Defense counsel also filed a motion for bond reduction—which is functionally equivalent to raising a speedy trial claim, *Cain v. Smith*, 686 F.2d 374, 384 (6th Cir. 1982)—that the court denied after conducting a hearing in May 2006.  Docket Sheet, Case No. 05-cr-740; Brief for Appellant, R.16-2, PageID#299.

On May 22, 2006, Miles filed a *pro se* letter to the court expressing his concern that "[t]he delay by the commonwealth to send the toboggan to the lab for testing was an obvious stall tactic and is depriving m[e] of my right to a fast and speedy trial."  Letter, R.1-3, PageID#128.  Then on June 7, 2006, Miles filed a *pro*

*se* motion to dismiss for failure to prosecute pursuant to Kentucky's speedy trial statute.  Docket Sheet, Case No. 05-cr-740.

At the hearing on September 26, 2006, the Commonwealth sought yet a third continuance, which defense counsel opposed to no avail.  R.16-2, PageID#357-358. Miles also filed a second *pro se* motion to dismiss for a failure to prosecute.  Docket Sheet, Case No. 05-cr-740; Magistrate Recommendation, R.56, PageID#1114.

Despite Miles's repeated requests, the trial court granted all three of the Commonwealth's motions for a continuance and ignored each of Miles's assertions of his right to a speedy trial.  By the time a jury was convened, Steven Edwards—a key eyewitness—had died in a motorcycle accident.  Petition, R.1-3, PageID#135-38; R.16-2, PageID#360.  His death in June 2006 was 15 months after the indictment, 6 months after the original trial date, and 2 months after the second trial date.

### C.    Trial

**1.**  At trial, the prosecution relied on the testimony of witnesses Frank Hill and Crystal Teasley.  Hill—an off-duty police officer working security at the club— witnessed Michael Teasley fighting in the club's parking lot with Miles, who had recently been removed from the club.  Trial Transcript, 122:8-12, R.53-1 (A148). After the altercation, Hill asked Teasley if he wanted Miles arrested; Teasley said "no," just "get him off the parking lot."  *Id.* at 123:6-7 (A149).  Hill thought Miles had a "calm demeanor" when leaving and did not hear any sort of threat, although

he recalls Miles saying to Teasley, "you got [the] best of me. You're the man. You're the winner." *Id.* at 123:15-16, 19 (A149); 166:1-7 (A192); 167:12-17 (A193). Hill described Miles as wearing "all dark clothing" and "maybe a toboggan." *Id.* at 123:19, 124:21-23 (A149-150).

Hill testified that around 3:30 a.m., when trying to clear the area after the club closed, he heard gunshots. *Id.* at 128:13-14 (A154). He estimated there were "maybe 60, 70 people" in the parking lot at that time, and "I couldn't hardly get through because the crowds of people was running towards me . . . ." *Id.* at 128:1-3, 17-19 (A154). Amidst this commotion, Hill observed a man "with all dark clothing on, running across the parking lot." *Id.* at 129:1-3 (A155). When interviewed by police the following morning, Hill categorically told them that the suspect "had a toboggan on." *Id.* at 150:1-7, 23-24, 152:1-13 (A176, A178). But he consistently testified that he never saw the man's face or front side. *Id.* at 148:8-13 (A174); 150:9 (A176). When pressed about his identification of Miles as the man who fought with Teasley and the man running across the parking lot, Hill testified that Miles "fit the description," but that "lots of people" could fit the description. *Id.* at 153:17-154:9 (A179-180).

While Hill did not see the face of the man running through the parking lot, Crystal Teasley, the victim's widow, did not see that man at all. She testified that she was working at the club and recognized Miles as a regular that evening. *Id.* at

199:12-21 (A225). She recalled that Miles was wearing "a black Dickie outfit with a hoodie" and a "black toboggan." *Id.* at 199:24-200:12 (A225-226). According to Crystal, after her husband fought with Miles and was pulled off him, Miles said, "you might have whupped my ass, but I'm going to get you." *Id.* at 203:19-20 (A229). In comparison, Hill admitted on cross-examination that "I never did hear [sic] that" statement by Miles. *Id.* at 166:14-24 (A192). Crystal also testified that Hill took Miles to his police car and, when returning to the club, told "everybody" that Miles "was nobody to play with. He would harm somebody. And he meant what he said, that he would come back and get him if that's what he said." *Id.* at 204:4-15 (A230). In Hill's own testimony, he never mentioned having made these alleged statements.

In addition to testimony from Hill and Teasley, the prosecution offered testimony that the police had collected spent bullets, a black toboggan hat, and a cell phone from the crime scene. *Id.* at 242:21 (A268), 243:21-244:6 (A269-270); 310:13-18 (A336). Detective Christopher Ashby, the lead investigator on the case, testified he did not send the hat off for testing until November 7, 2005—"nearly nine months" after recovering it. *Id.* at 368:16-23 (A394). When the DNA testing of the black toboggan finally came back, it did not match Miles. *Id.* at 313:4-12 (A339).

Ashby also told the jury that, when searching Miles's home, investigators collected "shoes, clothing, [and] a hand gun." *Id.* at 324:15-16 (A350). Ashby

admitted that the crime-scene bullets did not match the gun and therefore that the gun was not connected to the shooting. *Id.* at 324:16-325:2 (A350-351). Nonetheless, the prosecution published a picture of the gun to the jury and asked Ashby to describe exactly where the gun was located in Miles's bedroom. *Id.* at 325:10-24 (A351). When the prosecutor then moved for the picture to be introduced into evidence, defense counsel finally objected, which the court sustained. *Id.* at 326:1-13 (A352). As for the clothing, forensic testing confirmed that there was no blood; police never tested it for gunpowder residue. *Id.* at 330:23-331:3 (A356-357).

Lastly, a responding officer testified that she collected the cell phone from the ground outside the club. *Id.* at 253:12-19 (A279); 262:1-5 (A288). Another officer testified that the extracted cell number associated with the phone was 502-380-7343, which the prosecution argued matched the number Miles had provided on an Enterprise Rent-A-Car agreement. *Id.* at 281:5-17 (A307), 526:1-5 (A552). There was no dispute that Miles was at the club that evening or that he lost his phone.

**2.** The defense called two witnesses, including Vernon Douglas. He confirmed Miles was at the club that evening, but testified that Miles left with him around 3:00 a.m. *Id.* at 412:2-3 (A438); 413:3-16 (A439). On cross, the prosecutor pressed Douglas for nicknames of Miles, eliciting the aliases of "Cat Daddy" and "O.G.," which Douglas thought stood for "Original Gangster," a version of which

11

("Old Gangsta") would later become the centerpiece of the prosecutor's closing arguments.[5]  *Id.* at 423:3-13 (A449).

**3.**  During the trial, the prosecutor made numerous inappropriate arguments, most of which centered on improper propensity inferences and witness vouching. To start, the prosecutor told the jury in opening statements that, when searching Miles's residence, investigators found "a gun under the mattress, which we later found out was not the same gun used in the murder, but *he did, in fact, have a gun*." *Id*. at 98:1-3, R.53-1 (A124) (emphasis added).   The prosecutor also argued in closing that Miles was "just lying.  He's just lying," despite the fact that Miles did not testify in the case.  *Id.* at 523:21-22 (A549); *see Miles v. Commonwealth*, R.16-2, PageID#365-66 ("the comment amounted to prosecutorial misconduct").   The prosecutor also told the jury that "[Miles] gets others to lie," while assuring the jury that the victim's widow was "not lying, unlike some other witnesses that you heard from."  Trial Transcript, 525:18-20, (A551), 519:23-25 (A545), R.53-1.

Most egregiously, the prosecutor repeatedly referred to Miles as "Cat Daddy" and "Old Gangsta," and he used those nicknames as evidence that Miles had a motive to kill the victim.  At one point, the prosecutor argued that this was "Old Gangsta's" club and "[h]e was publicly humiliated" when Michael Teasley beat him.  These

---

[5] In closing, the prosecutor appears to have morphed the nickname Douglas provided, "Original Gangster," into the more suggestive "Old Gangsta."

were not casual references; the prosecutor intentionally made this a central theme and even projected them onto a screen for the jury. Magistrate Recommendation, R.56, PageID#1122-1123. He repeated the nicknames "Old Gangsta" four times and "Cat Daddy" six times, including in his final lines: "The evidence points to the man with the black on, the man that had the motive, the man that fits the identification to a tee. Points to *Cat Daddy*. It points to the *Old Gangsta*. Who done it? He's sitting right there." Tr. Transcript, Dec. 14, 2006, 511:9-15 (A537); 513:12-16 (A539); 516:1-4 (A542); 519:20-520:2 (A545-546); 523:8-24 (A549); 525:18-22 (A551); 526:13-21 (A552); 527:14-18 (A553); 528:4-10 (A554), R.53-1 (emphasis added).

**4.** After the two-and-a-half day trial, the jury convicted Miles of all charged offenses. *Id.* at 530:13-531:8 (A556-557). The trial court sentenced Miles to 50 years in prison. R.16-2, PageID#357.

### D.   Direct Appeal

On his direct appeal to the Kentucky Supreme Court, Miles raised the violation of his Sixth Amendment right to a speedy trial, among other claims. Brief for Appellant, R.16-2, PageID#283-308. The Kentucky Supreme Court acknowledged that it needed to apply the four-part balancing test articulated in *Barker v. Wingo*, 407 U.S. 514 (1972), namely: "1) length of the delay; 2) reason for the delay; 3) defendant's assertion of his right to a speedy trial; and 4) prejudice to the defendant." R.16-2, PageID#358. However, the court failed to even cite the

Supreme Court's decision in *Doggett v. United States*, 505 U.S. 647, 655 (1992), which instructs courts how to apply the *Barker* factors.  Further, when analyzing the second factor, the court never assessed whether the reason for the delay weighed against the Commonwealth or Miles; instead, the court made the determinative question whether the Commonwealth acted in bad faith.  In addition, the court failed to account for all of Miles's repeated assertions of his right to a speedy trial, and it improperly diminished the weight of this factor because "defense counsel did not initially object to the motions for continuance."  R.16-2, PageID#359.  Contrary to *Doggett*, the court also demanded "affirmative proof of particularized prejudice," without determining the importance of presumptive  prejudice in weighing the four *Barker* factors.  *Id.* at PageID#360.  And in assessing the proof of prejudice, the court addressed only the death of one eyewitness, not the stress, anxiety, and loss of liberty suffered by Miles as a result of the extraordinary delay.  *Id.* at PageID#358-60.

###        E.        State-Court Habeas Proceedings

**1.** Miles timely sought post-conviction relief under Kentucky Rule of Criminal Procedure 11.42, raising several claims.  Motion to Vacate, R.16-2, PageID#369-425.  Relevant here are three ineffective assistance claims based on his counsel's deficient and prejudicial performance.  Counsel's errors included: failure to object to the prosecutor's repeated references to the nicknames "Old Gangsta"

14

and "Cat Daddy;" failure to move to suppress the gun found in Miles's residence; and failure to object to Ashby's testimony that another witness had identified Miles in a photo pack as the patron who fought with Teasley. *Id.*

The trial court rejected Miles's claims. On the first two errors, it found that the prosecutor's use of Miles's nicknames did not prejudice Miles, Order, R.16-3, PageID#455, that defense counsel "reasonably questioned Ashby about [the gun's] lack of connection to the crime," *id.* at PageID#454, and that Miles failed to demonstrate prejudice about the hearsay testimony, *id.* at PageID#457-458.

**2.** The Kentucky Court of Appeals reversed. Opinion, R.16-3, PageID#528-545. As for the first ineffective-assistance claim, the court concluded that "the Commonwealth had no legitimate purpose in eliciting Miles's nickname 'Original Gangster' or calling him 'Old Gangster' in its closing argument." *Id.* at PageID#537. It therefore had "no difficulty" determining that the "prosecutorial misconduct" was "flagrant because the remarks tended to mislead the jury and prejudice Miles by inviting the jury to find him guilty based on protecting his gangster reputation." *Id.* at PageID#539-41. Given the "relatively weak" evidence against Miles and "considered in conjunction with other errors," this error "rendered the trial fundamentally unfair." *Id.* at PageID#541-42.

For the second ineffective-assistance claim, "the prosecutor's deliberate elicitation of testimony about th[e] gun, in conjunction with other inadmissible

evidence about Miles's nickname, was used to paint him as a criminal and could allow a conviction based upon a gun-wielding gangster reputation."  Accordingly, "trial counsel's failure to bring a motion in limine to exclude mention of the gun was prejudicial when considered in conjunction with other errors." *Id.* at PageID#543.

Lastly, the admission of testimonial hearsay "was not harmless when considered in conjunction with previous errors to improperly strengthen the case." *Id.* at PageID#543-44.   Thus, "[c]umulative error made the trial fundamentally unfair." *Id*.

**3.** The Kentucky Supreme Court reversed.  Opinion, R.16-4, PageID#737-49. It did not consider whether Miles's counsel provided deficient performance; instead, it found that Miles failed to establish prejudice. *Id.*  With regard to the references to "Old Gangsta" and "Cat Daddy," the court concluded that they were "de minimis" and that it was "speculative" whether their absence "would have changed the course of his verdict." *Id.* at PageID#744.  As for the gun, the court concluded that the information provided to the jury about the gun was irrelevant but not prejudicial since "the gun itself was not allowed to be submitted into evidence" and Ashby admitted it was not connected to the murder. *Id.* at PageID#746.  For the testimonial hearsay, the court noted that "[o]ther eyewitnesses' testimony at trial identified Miles as the individual who fought Teasley" so any Confrontation Clause problem caused no prejudice. *Id.* PageID#744-45.  Finally, it noted that cumulative error has

never formed the basis for post-conviction relief under Kentucky law. *Id.* at PageID#748.

### F.    Federal Habeas Proceedings

**1.**    Miles filed a timely habeas petition under 28 U.S.C. § 2254. The magistrate judge recommended denying relief on all claims. For the speedy trial claim, the magistrate judge found that the first and third factors weighed in favor of Miles while the second and fourth factors weighed in favor of the Commonwealth. Magistrate Recommendation, R.56, PageID#1111-17. Specifically, although "three continuances, resulting in a twenty-one-month period between indictment and trial, to test one piece of evidence is *problematic*," the second factor weighs in favor of the Commonwealth because the delay "does not appear to be motivated by bad faith." *Id.* at PageID#1113-14 (emphasis added). As for the fourth prejudice factor, the judge recommended that Miles failed to prove actual prejudice. Thus, it concluded there was on speedy trial violation. *Id.* at PageID#1114-17.

As for the ineffective-assistance claims, the magistrate judge recommended denying them because it concluded Miles failed to prove prejudice. The judge— while "recogniz[ing] that the nickname 'Old Gangster' or 'Original Gangster' signals a criminal background or history"—found that Miles did not demonstrate that the repeated references to his nicknames were used as a "rhetoric[al] trope" and thus the Kentucky Supreme Court did not unreasonably apply *Strickland* when

17

concluding they were "de minimis." *Id.* at PageID#1124-1125.  The judge likewise recommended that Miles failed to prove that further objections to the handgun evidence or to the testimonial hearsay would have changed the trial's outcome. *Id.* at PageID#1127-30.

The magistrate judge nonetheless recommended granting a certificate of appealability as to the above claims. *Id.* PageID#1088-144.  The district court adopted in full the magistrate judge's recommendation, denied the habeas petition, and granted a certificate of appealability.  Order, R.65, PageID#1241; Judgment, R.66, PageID#1242.

**2.**  When Miles filed his timely notice of appeal to this Court, he was housed at the Luther Luckett Correctional Complex ("LLCC") located in the Western District of Kentucky.  On June 25, 2019, the Warden transferred Miles to the Eastern Kentucky Correctional Complex ("EKCC") in the Eastern District of Kentucky.  Motion to Return Appellant, No. 19-5340, Doc. 9.  Miles filed a motion to be transferred back to LLCC on the basis that the Warden violated Federal Rule of Appellate Procedure 23(a) by failing to secure judicial permission before transferring custody of him. *Id.*

This Court appointed counsel for Miles and directed the parties to brief the transfer issue related to Rule 23(a) in addition to the claims that the district court had certified.  Order, 18-2.

## SUMMARY OF ARGUMENT

**I.** The Commonwealth violated Miles's Sixth Amendment right to a speedy trial.

**A.** The Kentucky Supreme Court concluded to the contrary only by failing to apply the correct legal standard, established by *Doggett v. United States*, 505 U.S. 647, for analyzing the four *Barker* factors. Specifically, the Kentucky Supreme Court asked only whether the prosecution acted in "bad faith" when seeking continuances, instead of determining whether the prosecution or Miles was responsible for the 21-month delay. The court also never considered the importance of presumptive prejudice when weighing the *Barker* factors, as required by *Doggett*; rather, the Kentucky Supreme Court required Miles to provide "particularized proof" of prejudice. Finally, it altogether failed to determine the weight of the first three *Barker* factors before balancing them. Because of these legal errors the Kentucky Supreme Court's holding was contrary to clearly established federal law and thus this Court owes that decision no deference.

**B.** Upon *de novo* review, Miles has established a violation of his Sixth Amendment right to a speedy trial. The 21-month delay is nearly twice the presumptively prejudicial length, the Commonwealth's gross negligence in testing the hat is the only reason for the delay, Miles asserted his right to a speedy trial (at a minimum) *eight* times, and he suffered all three kinds of prejudices recognized by

the Supreme Court.  Indeed, the Kentucky Supreme Court's rejection of Miles's claim would be an unreasonable application of *Barker* and *Doggett* even if it were not contrary to these clearly established rules of law.

**II.**  Miles's trial counsel rendered ineffective assistance of counsel in two respects.

**A.**  Counsel's failure to object to the prosecutor's intentional and repeated references to Miles as "Cat Daddy" and "Old Gangsta" during closing arguments was unreasonable and prejudicial.  As the Kentucky Court of Appeals concluded, these statements amounted to prosecutorial misconduct and invited the jury to convict based on improper propensity inferences that Miles was a criminal who had committed violent acts in the past.

Absent this bad-character inference, there is a reasonable probability that the outcome of the proceeding would have been different.  The prosecution's evidence was thin, to put it mildly.  Its case centered on Hill's testimony that Miles generally "fit the description" of a man in "dark clothing" with "maybe a toboggan hat." However, *no* physical evidence connected Miles to the crimes; indeed, all lab-tested evidence proved exculpatory.  Against this backdrop, the prosecutor's use of inflammatory nicknames to insinuate he was a dangerous gang member invited the jury to convict Miles based on improper propensity evidence.

**B.**  Counsel's failure to object to the introduction of a gun recovered from Miles's residence also was unreasonable and prejudicial.  Again, the prosecutor—while admitting the gun was not connected in any way to the charges—invited the jury to consider this evidence and convict based on the inference that Miles was the kind of man who wielded a hand gun.  This was pure impermissible character evidence.  And, without the prosecutor coloring Miles as someone who sleeps with a gun under his mattress, there is at least a reasonable probability that the jury would not have convicted in light of the "relatively weak" evidence.  Ky. Ct. of App. Op., R.16-3, PageID#541-42.

**III.**  The Warden violated Federal Rule of Appellate Procedure 23(a) when he transferred custody of Miles to the custody of a different warden without prior judicial permission.  Accordingly, this Court should issue a published opinion explaining that a district court must first authorize any transfer and only after a warden has demonstrated a "need" to do so.

<u>**STANDARD OF REVIEW**</u>

"In an appeal from the denial of habeas relief, [this Court] review[s] the district court's legal conclusions *de novo* and its factual findings for clear error." *Scott v. Houk*, 760 F.3d 497, 503 (6th Cir. 2014) (citation omitted).  Under AEDPA, this Court overturns a state conviction based on a constitutional challenge that was actually adjudicated on the merits only if the relevant state-court decision was

(1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Though the state court's judgment is usually entitled to deference under AEDPA, that "deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (internal quotation marks omitted). If the state court fails to adjudicate a federal issue that was presented, a federal habeas court decides the issue *de novo*. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

## **ARGUMENT**

### I.   THE KENTUCKY SUPREME COURT'S ADJUDICATION OF MILES'S SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW.

Miles is entitled to habeas relief because his Sixth Amendment right to a speedy trial was violated. In concluding otherwise, the Kentucky Supreme Court applied a legal standard contrary to clearly established federal law, and its decision is therefore not entitled to AEDPA deference. Under *de novo* review, this Court should hold Miles's right to a speedy trial was violated based on a nearly two-year delay attributable to the Commonwealth's gross negligence. For similar reasons, even if the Kentucky Supreme Court articulated a correct legal rule in general terms, it reached an unreasonable determination when applying this rule to the record.

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. Const., Amend. VI; *see also Kloper v. North Carolina*, 386 U.S. 213, 222-23 (1967) (holding the "fundamental" right to a speedy trial applicable to the States through the Due Process Clause of the Fourteenth Amendment). Although the "literal sweep" of the Sixth Amendment's text "would forbid the government to delay the trial of an 'accused' for any reason at all,"[6] the Supreme Court has instructed courts to balance four factors to determine whether an unconstitutional delay has transpired. *Doggett*, 505 U.S. at 651-52. Those factors are (1) whether the delay before trial was uncommonly long; (2) whether the government or the criminal defendant is more to blame for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice as a result of the delay. *Id.* at 651 (citing *Barker*, 407 U.S. at 530).

The first factor—uncommonly long delay—serves two functions. First, it operates as a "triggering mechanism" demarcating the line between acceptable delay and "presumptively prejudicial" delay that entitles the defendant to further examination of his speedy trial claim. *Barker*, 407 U.S. at 530-31. Courts uniformly

---

[6] The Supreme Court's cases require courts to apply the "balancing test" first articulated in *Barker*, 407 U.S. 514. Miles respectfully submits that this "balancing test" does not comport with the original meaning of the Sixth Amendment's guarantee of this fundamental right, but acknowledges this Court is bound by precedent.

agree that post-accusation delay approaching one year is "presumptively prejudicial." *Doggett*, 505 U.S. at 652 & n.1; *see, e.g.*, *United States v. Ferreira*, 665 F.3d 701, 705 (6th Cir. 2011) ("A delay of one year or more crosses the threshold and triggers analysis of the remaining *Barker* factors."). Second, delay is part of the substantive inquiry of prejudice because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652.

The second factor—the reason for the delay—seeks to determine "whether the government or the criminal defendant is more to blame for [the] delay." *Id.* at 651. Some reasons weigh more heavily against the government than others. For instance, "government delays motivated by bad faith, harassment, or attempts to seek a tactical advantage weigh heavily against the government." *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005). Other reasons, such as "negligence or overcrowded courts," are weighted less heavily but "should [still] be considered since the ultimate responsibility for such circumstances must rest with the government." *Barker*, 407 U.S. at 531.

The third factor—a defendant's assertion of his speedy trial right—"is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32.

Finally, the fourth factor—prejudice—includes harms such as "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility

that the defense will be impaired." *Id.* at 532. Notably, the Supreme Court does not limit "prejudice … to the specifically demonstrable" and has held that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655. Thus, because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," *id.*, it is error for a court to deny a speedy trial claim solely because a defendant cannot "demonstrate exactly" how the delay has prejudiced him, *id.* at 657. "While . . . presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay." *Doggett*, 505 U.S. at 655-56 (citation omitted).

### A. The Kentucky Supreme Court failed to apply the clearly established legal standard and is owed no deference.

Although the court initially identified the four *Barker* factors, R.16-2, PageID#358, it applied the wrong legal standard to the second and fourth factors and failed to determine what weight to assign each factor, thereby making meaningful review of the balancing analysis impossible.

**1.** First, the Kentucky Supreme Court failed to ask the relevant legal question in analyzing the second factor: "whether the government or the criminal defendant is more to blame for that delay." *Doggett*, 505 U.S. at 651. Because the government must take "[a]ffirmative steps" "to ensure that a timely trial occurs," *Cain*, 686 F.2d

at 382, the inquiry focuses on whether the government exercised "reasonable diligence" in prosecuting the case, *Doggett*, 505 U.S. at 656. Even reasons such as "negligence" are weighted against the government because it has "the ultimate responsibility" for trying a defendant in a timely fashion. *Barker*, 407 U.S. at 531.

Instead, the state court analyzed only whether the prosecution acted in "bad faith" in its delay in testing the toboggan. To be sure, bad faith by the prosecution would be an important fact, but its absence is far from the end of the inquiry. Even government efforts made "in good faith" can nevertheless *not* be "performed diligently." *United States v. Ingram*, 446 F.3d 1332, 1339 (11th Cir. 2006). The Kentucky Supreme Court never analyzed whether the Commonwealth was grossly negligent in waiting nearly 9 months to even send the hat to be tested, which is not "reasonable diligence" under any circumstance. *Doggett*, 505 U.S. at 565. Nor did it consider whether the Commonwealth was grossly negligent for taking over a year to conduct a simple DNA test, which even the district court found "problematic." R.56, PageID#1113. Indeed, even if all the mishaps in getting the hat tested were due to simple negligence or bureaucratic sluggardness, this reason still weighs against the Commonwealth because it has the "affirmative constitutional obligation to try the defendant in a timely manner." *United States v. Graham*, 128 F.3d 372, 374 (6th Cir. 1997) (internal quotation marks omitted). Lack of "bad faith" is not dispositive, yet the Kentucky Supreme Court treated it as such.

26

**2.**  The Kentucky Supreme Court also reached a determination on the fourth *Barker* factor that was contrary to clearly established federal law.  In *Doggett* (which the court never even cited), the Supreme Court instructed that the accused need not point to "affirmative proof of particularized prejudice" in every case.  505 U.S. at 655.  That is because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."  *Id.*  Admittedly, the presumption of prejudice does not suffice in every case where delay triggers consideration of the *Barker* factors; rather, the first three factors determines whether the presumption suffices or whether a showing of actual prejudice is required.  *Id.* at 656-58.

Here, the Kentucky Supreme Court's acknowledgment that the 21-month delay was "presumptively prejudicial" came only in the "threshold context" where "'presumptive prejudice' . . . simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry."  *Doggett*, 505 U.S. at 652 n.1.  In undertaking the *Barker* analysis, the court evaluated only whether Miles proved *actual* prejudice.  Concluding that he did not demonstrate prejudice through impairment of his case, it then concluded there was no speedy trial violation.  R.16-2, PageID#360.  Contrary to *Doggett*'s clear instruction, the Kentucky Supreme Court never explicitly weighed the first three factors to determine if the presumption of prejudice was sufficient.

27

This Court's analysis in *Ferreira* is illustrative and highlights how the Kentucky Supreme Court erred. There, the district court found the nearly three-year delay triggered full review of the *Barker* factors; the government's conduct was "beyond simple negligence"; and the defendant repeatedly asserted his right. 665 F.3d at 705-06 (internal quotation marks omitted). Finding that the first three factors weighed heavily against the government, this Court concluded that the defendant need not point to any identifiable prejudice but that the presumption sufficed. *Id.* at 707-08. To require a specific "reason to believe" a defendant suffered significant prejudice would "undermine the reasoning articulated in *Doggett* for creating a presumption in the first place," namely that "prolonged and unjustifiable delays" cannot be tolerated "simply because the accused cannot demonstrate exactly how it has prejudiced him." *Id.* at 707-08 (internal quotation marks omitted).

The Kentucky Supreme Court also ignored the other two forms of actual prejudice recognized by the Supreme Court and raised by Miles: "oppressive pretrial incarceration" and "anxiety and concern of the accused." *Barker*, 407 U.S. at 532. This was yet another failure to apply clearly established federal law.

**3.** The Kentucky Supreme Court also never completed the *Barker* analysis by stating whether, and to what degree, each of the factors weighed in favor or against a conclusion that the Commonwealth violated Miles's speedy-trial right. The *Barker* and *Doggett* balancing analysis cannot be applied without assessing the weight of

28

each factor; it is inherent in the legal test.  *See Ingram*, 446 F.2d at 1336 ("the district court failed to complete the *Barker* analysis by stating how heavily each factor weighs against the identified party").  Yet the Kentucky Supreme Court merely stated that, "[u]pon consideration of all of the above factors in *Barker*, we adjudge that Miles was not denied his right to a speedy trial in this case."  R.16-2, PageID#360.  Without explaining which factor favored which party and how heavily it did so, the court rendered impossible any meaningful review of its analysis.

### B.    Under the clearly established legal standard, Miles suffered a violation of his Sixth Amendment right to a speedy trial.

The almost two-year delay is nearly twice the presumptively prejudicial length, the Commonwealth's gross negligence in testing the hat was the sole reason for the delay, Miles repeatedly and vigorously asserted his right, and the strength of these first three factors makes a showing of actual prejudice unnecessary.  And even if the presumption of prejudice is insufficient, Miles also proved all three kinds of actual prejudice.

**1.**    The Kentucky Supreme Court agreed the 21-month delay was "presumptively prejudicial," triggering analysis of the remaining factors.  But the delay is more than that; it is itself a consideration in the subsequent balancing test.  *See Doggett*, 505 U.S. at 652.  And the strength of the presumption varies depending on the crime, such that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."  *Barker*, 407

U.S. at 531. Here, the nearly two-year delay is twice the "presumptively prejudicial" length. Furthermore, the charges were not complex, and the trial lasted only two and a half days. The first factor therefore weighs heavily in Miles's favor.

**2.** The Commonwealth was grossly negligent in prosecuting Miles, first by failing to send "crucial evidence" for testing for nearly 9 months and then taking over a year to complete the test. This negligence manifested itself in three motions for continuances—all of which were solely attributable to the Commonwealth.

Despite investigators collecting the hat in February 2005, the prosecution did not bother to send it to the lab until November 7, 2005. R.16-2, PageID#357. That inexplicable time lapse alone makes the second factor weigh heavily in Miles's favor. *Cf. Ferreira*, 665 F.3d at 703, 706 (government's misplacement of a state-custody transfer notice and misdirection of a petition for a writ of habeas corpus *ad prosequendum* was "beyond simple negligence" (internal quotation marks omitted)). This failure to exercise "reasonable diligence" is compounded by the prosecutor's misrepresentations to the court. At a pretrial hearing in December 2005, he told the court that the lab had the hat "for a number of months now." Pretrial Hearing, Dec. 5, 2005, 3:15, R.21-1 (A10). In reality, it had been there less than 30 days. Whether an intentional or inadvertent exaggeration, this was at least a tacit admission that the delay was inexcusable. The delay up to that point can conceivably only be weighed against the Commonwealth.

The following year-long delay is also attributable to the Commonwealth. The prosecution sought and obtained, over objection, three continuances. Although defense counsel did not initially object to the hat being tested during the December 2005 hearings, agreeing that evidence *might* be probative is not equivalent to agreeing to a trial delay while the prosecution acts negligently in obtaining the evidence. Ky. S. Ct. Op., R.16-2, PageID#357-59. Nevertheless, the record flatly refutes that the first motion for a continuance was unopposed, as defense counsel filed a motion for speedy trial and Miles interjected that the prosecutor's motion was a "stall tactic." Pretrial Hearing, Dec. 5, 2005, 5:21-6:3, R.21-1 (A12-13). Even before then, Miles filed a *pro se* letter asserting his right to a speedy trial. And the motions for the second and third continuances, in April and September 2006, were clearly contested as well.

Next, thirteen months is *not* a reasonable time period to conduct a simple DNA test and the Commonwealth provided no good explanation for the delay, despite "the burden [being] on the prosecution to explain the cause of the pre-trial delay." *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (internal quotation marks omitted). Quite the opposite: the prosecutor first conceded that "the lab had not even started testing the hat" as of March 3, 2006, R.16-2, PageID#357-58, but then told the court the next month that the delay was just "the process that this DNA had to go through," Pretrial Hearing, Apr. 11, 2006, 4:11-13, R.21-1 (A22). Maybe the

hat went to the wrong lab; maybe it got misplaced at the correct lab; maybe it was given low priority by the lab, despite the presumptively prejudicial delay of a murder trial. But that is irrelevant, as "[u]nexplained delay is weighed against the prosecution." *Redd v. Sowders*, 809 F.2d 1266, 1269 (6th Cir. 1987). The prosecution, moreover, told the court that it had regularly contacted the lab to check on the status of the DNA test, but it gave no indication of *any* effort—not even a mere request—to have the lab expedite its work, notwithstanding the 9-month delay that preceded the lab's receipt of the hat. R.16-2, PageID#359.

Regardless of who was negligent in testing the hat—whether the prosecution, the lab, or both—the extraordinary delay in a single DNA test lay wholly at the Commonwealth's feet as the party seeking additional evidence to bolster its chances of conviction.[7] *See, e.g.*, *Graham*, 128 F.3d at 374 ("[T]he court must consider whether the reasons for the extraordinary delay are of a sort that work for the good of the accused, or against him.").

---

[7] The government's theory did an about-face, from pleading with the court that this was "crucial evidence" to disavowing to the jury that the hat had any relevance at all. Pretrial Hg., Apr. 11, 2006, 3:2, R.21-1 (A22). This demonstrates that the prosecution stalled trial for the sole purpose of obtaining *additional* evidence against Miles for fear of an acquittal. *Id.* at 3:18-22 (seeking a "motion for a continuance based on the outstanding potential DNA evidence"). But a continuance premised on the government's inability "to successfully prosecute the defendant at the present time" cannot "indefinitely postpone trial" and must weigh "heavily in the ultimate determination of appellant's [speedy trial] claim." *Arrant v. Wainwright*, 468 F.2d 677, 680-81 (5th Cir. 1972).

**3.** Miles's repeated assertions of his right to a speedy trial should be afforded "strong evidentiary weight," *Barker*, 407 U.S. at 531, particularly in light of "[t]he timeliness, vigor and frequency" with which he asserted his right, *Redd*, 809 F.2d at 1271.

A brief recounting of the timeline demonstrates the point. Miles asked the court for a speedy trial in November 2005; he objected to the Commonwealth's continuance motion at the hearing on December 5, 2005; his counsel filed a motion for speedy trial on December 13, 2005; his counsel objected to the second continuance in April 2006; his counsel filed a motion to reduce his bond in April 2006; Miles sent a letter to the trial court demanding a speedy trial in May 2006; he filed a *pro se* motion to dismiss for failure to prosecute in June 2006; his counsel objected to the third continuance in September 2006; and Miles filed a second *pro se* motion to dismiss for failure to prosecute in September 2006. A conservative count demonstrates at least eight separate assertions of the speedy trial right. These timely, vigorous, and frequent assertions make this factor weigh strongly in Miles's favor.

**4.** Miles should prevail even without a showing of actual prejudice. As the Supreme Court explained in *Doggett*, whether actual prejudice must be shown is a function of the strength of the first three factors, particularly the reason for delay. 505 U.S. at 657. Here, all three factors weigh heavily in Miles's favor. In these

circumstances, Miles's speedy-trial right would have been violated even if he were "unable to articulate the harm caused by the delay;" it would suffice that the delay "presumptively compromise[d] the reliability of a trial in ways that neither party can prove." *Ferreira*, 665 F.3d at 706 (internal quotation marks omitted).

Nonetheless, Miles established all three recognized forms of actual prejudice. Miles filed a post-trial motion to dismiss based on a speedy trial violation wherein he identified Edwards as an eyewitness who passed away in a motorcycle accident in June 2006. R.16-2, PageID#360; R.1-3, PageID#135-138. *Doggett* acknowledged that "time's erosion of exculpatory evidence and testimony can rarely be shown," 505 U.S. at 655 (internal quotation marks omitted), and "[i]t goes … without saying that the death or unavailability of a witness . . . prejudices the defense," *Graham*, 128 F.3d at 375. This Court has not required more than identification of potential witnesses to establish actual prejudice in similar cases. For example, in *Redd*, this Court found prejudice when the defendant argued that possible alibi witnesses could have substantiated his defense theory, but that his pretrial incarceration inhibited his ability to locate them. 809 F.2d at 1272.

The Kentucky Supreme Court and district court wrongly discounted Edwards's testimony because he had not been issued a trial subpoena for the December 2005 or April 2006 trials. But the parties were well aware beforehand that the Commonwealth was seeking continuances, and nothing in the record

34

indicates that *any* witnesses had been issued trial subpoenas by either party for those trial dates. Next, both courts faulted Miles for not anticipating the freak accident that killed Edwards in June 2006 and for not having memorialized his testimony beforehand. But, unlike civil litigants, criminal defendants do not have the benefit of depositions or the opportunity to secure grand jury testimony of favorable witnesses. Nor does a finding of actual prejudice in the speedy trial context require that heightened kind of proof. Rather, Miles suffered the specific, identifiable harm of being denied the ability to call an eyewitness.[8]

Miles also proved prejudice through "oppressive pretrial incarceration." *Barker*, 407 U.S. at 532. Miles was held in a more secure facility and ineligible to participate in particular programs due to the pending charges, as reflected in his custody score on June 1, 2006. Reclassification Custody Form, R.1-3, PageID#130. Delay preventing eligibility to receive a more favorable custody condition—even if not qualifying for release—harms a protected "liberty interest" recognized by the speedy trial right. *Maples*, 427 F.3d at 1032.

Miles also showed prejudice through the anxiety and concern that he suffered while waiting 21 months to be tried for murder. Miles sent the court letters

---

[8] Because the Warden's Rule 5 Answer did not include portions of the record on direct appeal, this Court cannot determine whether Miles's affidavit explaining Edwards's testimony was part of the record before the Kentucky Supreme Court. R.1-3, PageID#137.

explaining the stress and unrest the delay was causing him, including the fact that the prison psychiatrist was treating him with medication for depression and anxiety. Letter, Mar. 3, 2006, R.1-3, PageID#127 ("Dear Judge, I just want to let you know how stressful it is for me and my family by the Commonwealth Attorney's stall tactics."); Evaluation Form, July 20, 2005, R.1-3, PageID#132-34. This Court has held that similar letters prove a defendant suffered "anxiety and concern." *Maples*, 427 F.3d at 1032.

In sum, Miles has clearly shown a violation of his speedy trial right. The Kentucky Supreme Court's contrary conclusion was based on legal standards that conflicted with U.S. Supreme Court precedent. And even if the Kentucky Supreme Court articulated the correct governing precedent in broad strokes, it unreasonably applied that clearly established law to Miles's case. This Court should reverse the district court's judgment and order it to grant Miles's habeas petition.

## II.   THE KENTUCKY SUPREME COURT'S DETERMINATION THAT MILES WAS NOT PREJUDICED BY HIS COUNSEL'S FAILURE TO OBJECT TO INFLAMMATORY NICKNAMES AND EVIDENCE OF AN UNRELATED GUN WAS CONTRARY TO, AND AN UNREASONABLE APPLICATION OF, FEDERAL LAW.

This Court should grant Miles habeas relief because his trial counsel was ineffective in two respects. First, trial counsel failed to object to the prosecutor's flagrant repetition of the nicknames "Old Gangsta" and "Cat Daddy" throughout closing arguments. Second, trial counsel failed to move to suppress evidence of a gun found at Miles's residence, which the Commonwealth acknowledged was

unrelated to any charge. Trial counsel admitted he was deficient in both regards and the Kentucky Court of Appeals agreed. Ky. Ct. of App. Op., R.16-3, PageID#536, 539-43. On discretionary review, the Kentucky Supreme Court addressed only the prejudice prong of *Strickland*. In finding that Miles did not suffer prejudice, that court unreasonably applied federal law by wholly abdicating its obligation to conduct a "probing and fact-specific analysis" of prejudice. *See Sears v. Upton*, 561 U.S. 945, 955 (2010).

Defense counsel renders constitutionally ineffective assistance when his performance is both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668 (1984). To establish deficiency, a defendant must show his "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Further, prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A.    **The use of "Old Gangsta" and "Cat Daddy" caused Miles prejudice.**

The nicknames "Old Gangsta" and "Cat Daddy" bore no relevance to establish identity, motive, or any disputed material fact, and the prosecution's flagrant use of these nicknames only served to encourage the jury to rely on impermissible

propensity inferences. Indeed, the prosecutor repeatedly resorted in his closing to a host of improper propensity arguments:

- "They're not going to kick him out. This is his club. This is *Cat Daddy, Old Gangsta*. . . . He gets kicked out of another club. It's no big deal. He gets kicked out of clubs. That tells you something about him."

- "What's his state of mind? He's known as *Cat Daddy* there. He's known by *Old Gangsta*. But that night was different. He was publicly humiliated."

- "What do you know about *Cat Daddy*? You know he's 5' 10. You know he's got a lean build."

- "He wants to make a big deal about that hat. . . I would, if I thought the hat played any role at all. . . It's covered in leaves. It's covered in crusty old dirt. Do you think the *Old Gangsta Cat Daddy*'s going to be wearing this thing to the club?"

- "And [Mike Teasley] was killed because *Cat Daddy* got his feelings hurt. That's why he was killed."

- "The evidence points to the man with the black on, the man that had the motive, the man that fits the identification to a tee. Points to *Cat Daddy*. It points to the *Old Gangsta*. Who done it? He's sitting right there."

Tr. Transcript, Dec. 14, 2006, 511:9-15 (A537); 513:12-16 (A539); 516:1-4 (A542); 519:20-520:2 (A545-546); 523:6-24 (A549); 525:18-22 (A551); 526:13-21 (A552); 527:14-18 (A553); 528:4-10 (A554), R.53-1.

    **1.** The "propriety of using a defendant's nickname" turns on whether the name was "necessarily suggestive of a criminal disposition." *United States v. Farmer*, 583 F.3d 131, 145 (2d. Cir. 2009) (internal quotation marks omitted).

"When a defendant charged with a crime of violence is identified before a jury by a nickname that bespeaks guilt, violence, or depravity, the potential for prejudice is obvious." *Id.* at 135. It is thus error to permit the use of such nicknames unless "the nickname is truly needed to identify the defendant" or "connect him with the crime" and then only if "the probative value is substantially outweighed by any danger of unfair prejudice." *Id.* Moreover, a "repeated, gratuitous invocation" of a suggestive nickname invites the jury to infer that the defendant had earned his nickname as "an unsavory character or even a criminal." *Id.* at 146-47 (quoting *United States v. Williams*, 739 F.2d 297, 300 (7th Cir. 1984)). That is "precisely what Rule 404(a) was designed to prevent." *Id.* at 147.[9]

As the Kentucky Court of Appeals concluded, the prosecution's use of "Old Gangsta" and "Cat Daddy" was not only improper, it was "flagrant" "prosecutorial misconduct" "because the remarks tended to mislead the jury and prejudice Miles by inviting the jury to find him guilty based on protecting his gangster reputation." Ky. Ct. of App. Op., R.16-3, PageID#541. To be sure, identity is usually the *only* permissible use of an incriminating nickname. *See, e.g.*, *United States v. Wilkerson*,

---

[9] Kentucky Rule of Evidence 404(a) substantially mirrors the language of Federal Rule of Evidence 404(a). *Compare* Ky. R. Evid. 404 (a) ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion.") *with* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").

456 F.2d 57, 59 (6th Cir. 1972) ("Only when proof of an alias is relevant to identifying the defendant should a court allow its inclusion in the indictment and its subsequent introduction at trial."). But here, not a single prosecution witness referred to Miles by "Old Gangsta" or testified that they knew Miles by that name. The prosecution elicited "Old Gangster" and "Cat Daddy" after asking a defense witness whether Miles had any nicknames, Trial Transcript, 423:1-12, R.53-1 (A449), a question that does not appear to have any admissible purpose.[10]

Even if that single question to a defense witness is excusable, the prosecutor's conduct during closing was not. The prosecutor's repeated references to Miles's nicknames allowed the jury to infer that he is a man who has earned a reputation as a gang member—someone who commits violent crimes, so he likely committed this murder too. *See id*. at 511:9-15 (A537). The unadulterated propensity inference is likely why trial counsel admitted he was deficient in failing to object. Ky. Ct. of App. Op., R.16-3, PageID#536. And, since the Kentucky Supreme Court never addressed the Kentucky Court of Appeals' finding of deficiency, this Court applies

---

[10] The Commonwealth argued below that the nicknames demonstrated "motive." That makes no sense—an alias or nickname can give only the permissible inference to a jury that someone was known by a different name. It cannot bear on that person's subjective motive or intent to commit an act. The only way it does is if the jury is allowed to make a propensity inference that someone with that kind of criminal nickname is the kind of person who commits crimes, i.e., that he's a gangster who acted like a gangster here. Permissible "motive" evidence should have been limited here to the allegations of an altercation between the victim and Miles.

*de novo* review and should easily conclude Miles satisfies this first step. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009).

**2.** The Kentucky Supreme Court's determination that there was no prejudice was based on an unreasonable determination of fact and on a failure to conduct a "probing and fact-specific analysis" of prejudice. *Sears*, 561 U.S. at 955.

First, the entire prejudice discussion was colored by an erroneous finding of fact about the number of references to Miles as "Old Gangsta" and "Cat Daddy." The Kentucky Supreme Court found the nicknames were used on only "three separate occasions" during "closing argument." Ky. S. Ct. Op., R.16-4, PageID#742-43. Then, based solely on a count of how many times the nicknames were used, the court distinguished Miles's claim from *Farmer*, 583 F.3d 131, where the Second Circuit held that using a nickname as a "rhetorical trope" "no fewer than thirty times" was prejudicial and warranted reversal. Ky. S. Ct. Op., R.16-4 PageID#743-44. But it never considered the specific ways that the prosecutor used "Old Gangsta" and "Cat Daddy," such as projecting the names on a screen during closing, and repeating them in the final lines spoken to the jury. Magistrate Recommendation, R.56, PageID#1122-1123. It also ignored another obvious difference about the frequency of the nicknames: Miles's trial lasted less than three days; Farmer's stretched over three weeks. *Farmer*, 583 F.3d at 144.

41

Setting aside the initial elicitation from Vernon Douglas, the prosecutor used the phrase "Old Gangsta" *four* times and "Cat Daddy" *six* times during closing. Trial Transcript, 511:9-15 (A537); 513:12-16 (A539); 516:1-4 (A542); 526:13-21 (A552); 527:14-18 (A553); 528:4-10 (A554), R.53-1. The Kentucky Supreme Court's prejudice finding—which revolved entirely around the number of references to the nicknames instead of *how* they were used—is based on this unreasonable determination of the facts. Thus, AEDPA deference does not apply. *See* 28 U.S.C. § 2254(d).

Second, the Kentucky Supreme Court applied a prejudice standard contrary to clearly established federal law by entirely forgoing a "probing and fact-specific analysis." *Sears*, 561 U.S. at 955. An analysis of prejudice requires consideration of "the totality of the available [] evidence." *Id.* at 955-56. A fulsome review of the evidence is required because the weaker the prosecution's case, the more likely that a defendant has established a "reasonable probability" that the outcome would have been different. As such, this inquiry "will necessarily require a court to 'speculate' as to the effect of the [omitted] evidence." *See id.* at 956. The U.S. Supreme Court has vacated a denial of habeas relief under § 2254 for failure to conduct this very kind of prejudice analysis. *Id.* at 946 (state court erroneously concluded that "it could not speculate as to what the effect of additional evidence would have been").

The Kentucky Supreme Court completely failed to do any of the above.  It never once mentioned the toboggan hat, the cell phone, testimony about the fight with Mike Teasley, testimony about a black man running in the parking lot, or *any* evidence introduced at trial by the Commonwealth.  It summarily concluded that "[t]hese comments, in the context of an entire trial, were de minimis" and a different outcome was "*speculative*."  Ky. S. Ct. Op., R.16-4 PageID#743-44 (emphasis added).  This "truncated prejudice inquiry"—which does not even attempt to determine the weight of evidence against Miles and which affirmatively disavows the "speculati[on]" that is "necessarily required"—is contrary to the clearly established law recognized by the U.S. Supreme Court in *Sears v. Upton*.  561 U.S. at 955-56.

Because the Kentucky Supreme Court's determination was based on an unreasonable determination of the facts and contrary to clearly established law, AEDPA deference does not apply.

Upon *de novo* review, the Commonwealth's case was "relatively weak."  Ky. Ct. of App. Op., R.16-3, PageID#541-42.  As the Kentucky Court of Appeals found, "[t]here was absolutely no physical evidence tying Miles to the crime."  *Id.* at PageID#542 n.4.  Miles's DNA did not match the toboggan, the gun found in his house did not match the spent bullets found at the scene, and nothing recovered from his home or rental car connected him to the shooting.  Additionally, the

Commonwealth offered no eyewitness testimony, despite there being "60, 70 people" in the parking lot when the shooting occurred. Trial Transcript, 128:2-3, R.53-1 (A154). The best prosecution witness—Frank Hill—testified that he saw a "man in black clothing" running in the crowded parking lot, at 3:30 a.m., approximately 40-feet away from him, and that this person generally "fit the description" of the man who fought with the victim earlier in the evening. *Id.* at 154:6 (A180); 125:16 (A151); 129:11-12 (A155); 153:24 (A179); 154:1 (A180). He qualified that vague testimony even further: "I did not see the shooting take place," "I never saw the front part of the individual," and "lots of people" fit that description. *Id.* at 147:25 (A173); 149:17-18 (A175); 154:1-3 (A180). There is substantial doubt whether this person was even the shooter, rather than one of the scared patrons fleeing from the chaos.

The prosecution relied heavily on Crystal Teasley's testimony that Miles allegedly threatened Mike Teasley after their confrontation earlier in the evening. *Id.* at 203:19-20 (A229) ("I'm going to get you."). Even if the jury found Crystal credible, there is a reasonable probability that the jury would not have convicted based on this lone statement. And Crystal's credibility was significantly undercut by her testimony that Hill had warned her after breaking up the fight that Miles was "nobody to play with" and that "he meant what he said," *id.* at 204:11-15 (A230),

44

because Hill testified that he never heard Miles make any sort of threat, *id.* at 166:1-7 (A192); 167:12-17 (A193).

The cell phone found behind the club also proved little. As the Kentucky Court of Appeals noted: "While the discovery of Miles's phone in the parking lot placed him in the area that evening, his presence at the club and in the parking lot earlier was undisputed, this area was used by all the club's patrons and did not establish that Miles had anything to do with the shooting." Ky. Ct. of App. Op., Aug. 22, 2014, R.16-3, PageID#542 n.4.

Absent the impermissible propensity inference that was encouraged by the "rhetorical trope" of the nicknames, there is undoubtedly a reasonable probability that the outcome would have been different. *Farmer*, 583 F.3d at 147. None of the evidence introduced at trial so outweighs the prosecutorial misconduct as to provide confidence that regardless of the misconduct, the prosecution would have secured a conviction. Based on this thin record, counsel's admittedly deficient performance "undermines confidence in the outcome." *Strickland*, 455 U.S. at 693-94.

## B.    The evidence of an unrelated gun caused Miles prejudice.

**1.** All agree that the gun found in Miles's home was not used in, or connected to, the charged offenses. Yet the prosecutor told the jury in opening about the gun under Miles's mattress and even published a picture of the gun to the jury during Detective Ashby's testimony. Ky. S. Ct. Op., R.16-4, PageID#745. The Kentucky

Supreme Court agreed with the lower state court that the gun was irrelevant and should not have been admitted. *Id.* at PageID#746. The prosecution's only possible reason for introducing it was to convince the jury to convict Miles on a plainly impermissible basis: propensity evidence. *See, e.g.*, *Major v. Commonwealth*, 177 S.W.3d 700, 704, 710 (Ky. 2005) (reversing conviction for murder because of "admission into evidence of firearms unconnected to the crime charged"). As trial counsel himself admitted and the Kentucky Court of Appeals found, he performed deficiently in failing to move to suppress evidence of the gun. Ky. Ct. of App. Op., R.16-3, PageID#532.

**2.** The Kentucky Supreme Court committed two legal errors when it resolved this claim on the prejudice ground. First, while citing *Strickland* earlier in its opinion, here it cited *Harris v. Commonwealth*, 384 S.W.3d 117, 123-24 (Ky. 2012), and concluded that evidence of the gun was "harmless." Ky. S. Ct. Op., R.16-4, PageID#746. *Harris* addressed harmless error review on direct appeal. 384 S.W.3d at 125. Under Kentucky rules, to reverse under the harmless error standard, the trial court's ruling must have "affect[ed] the substantial rights of the parties." Ky. R. Crim. Proc. 9.24. The Kentucky Supreme Court thus "mischaracterized at best the appropriate rule" for prejudice under *Strickland*, setting the bar higher and thereby making its prejudice analysis contrary to clearly established federal law. *See Williams v. Taylor*, 529 U.S. 362, 397 (2000).

Second, the court again failed to apply the fact-specific prejudice analysis of whether, absent any mention of the gun, there was a reasonable probability that the outcome would have been different. Instead, it concluded "Miles has failed to prove prejudice" because the jury was informed that the gun was not related to the charged offenses and, although a picture and testimony were allowed, the gun itself was not admitted into evidence. Ky. S. Ct. Op., R.16-4, PageID#746. But the court never considered how evidence of gun ownership—particularly in a murder-by-shooting case—is prejudicial or why gun ownership generally might be prejudicial. This was error, both because the court failed to even weigh the evidence against Miles (and thus failed to apply the correct prejudice analysis as required by *Sears v. Upton*) and because the court's determination regarding prejudice was unreasonable. For all the reasons explained above, there was little evidence beyond improper propensity inferences upon which a jury could find Miles guilty. Given the lack of evidence, he has sufficiently demonstrated prejudice.

## III. THE WARDEN VIOLATED FEDERAL RULE OF APPELLATE PROCEDURE 23(a).

The Warden violated Federal Rule of Appellate Procedure 23(a) when he transferred Miles after this appeal was pending from LLCC to EKCC without prior judicial permission. Under such a circumstance, the proper remedy is for the district court to order Miles's return to LLCC before this Court resolves his habeas appeal.

Rule 23(a) provides:

Pending review of a decision in a habeas corpus proceeding commenced before a court, justice, or judge of the United States for the release of a prisoner, the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule. When, upon application, a custodian shows the need for a transfer, the court, justice, or judge rendering the decision under review may authorize the transfer and substitute the successor custodian as a party.

The district court is the proper judicial body to order the transfer and substitution of custodians.  The text of Rule 23(a) contemplates that the "judge rendering the decision under review"—here, the district court—is the one with proper authority.

This procedural rule is "designed in part to preserve the district judge's power over the physical custody of the petitioner by prohibiting the custodian from transferring custody of the prisoner to another." *Jago v. U.S. Dist. Ct.*, 570 F.2d 618, 626 (6th Cir. 1978).  Rule 23(a) recognizes that in habeas litigation "the body of the petitioner [has come] under the lawful control of the district court."  *Id.* at 621. Habeas proceedings are unlike other civil actions in that "the writ is essentially a very physical one."  *Id.* at 620-21.  Importantly, "the question concerning physical custody of the defendant pending review does not affect the matters involved in the appeal itself" because "the … petitioner is not physically transferred to the appellate court," although jurisdiction over the legal issues has been transferred.  *Id.* at 622. That is precisely why Rule 23(a) requires the Warden to seek the district court's

permission before transferring the petitioner because, in a legal sense, the "body of [the petitioner is] before the court or judge," and only that court can determine if the petitioner "may be liberated," transferred, or returned to state custody. *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)).

Relatedly, Rule 23(a) assists in the core purpose of habeas by ensuring that the district court maintains jurisdiction to enforce its orders against the proper custodian. Thus, *before* transferring a petitioner, the current custodian must receive approval in order that any judgment granting relief is entered against the proper respondent who has physical control over the petitioner. *See Rumsfeld*, 542 U.S. at 434-35 ("the habeas statute" "contemplate[s] a proceeding against some person who has the *immediate custody* of the party detained" (internal quotations marks omitted)).

Here, the Warden concedes that he transferred Miles from LLCC to EKCC after his appeal was docketed in this Court. Response, No. 19-5340, Doc. 14-1 at 1. He further concedes that he did not file an application showing the need for the transfer with the district court or receive permission prior to doing so.[11] *Id.* Per

---

[11] Even if the Warden had properly sought judicial approval, he failed to demonstrate a "need" to transfer Miles. *See* Rule 23(a). Proving a "need" requires more than a showing of bureaucratic convenience. Rather, the Warden must establish that the transfer was a "requirement" or necessary to address "[t]he lack of something important." Black's Law Dictionary (definition of "need") (11th ed.

Rule 23's plain text and the rationale underlying it, the Warden's actions clearly violate the rule. *See* Order, No. 19-5340, Doc. 18-2 at 11; *see, e.g.*, *Cohen v. United States*, 593 F.2d 766, 767 n.2 (6th Cir. 1979).

In response, the Warden argues that there was no Rule 23(a) violation because both the "circuit court and the district court retained jurisdiction." No. 19-5340, Doc. 14-1 at 4. It is true that § 2241(d) provides concurrent jurisdiction over Miles's petition to both the Western and Eastern Districts of Kentucky, and this Court retains jurisdiction over his legal claims. But this is irrelevant to whether the Warden violated Rule 23(a). The violation was complete upon the unauthorized transfer, and the harm continues because the EKCC warden has not been substituted for the LLCC warden as a party.

Under these circumstances, where the Warden has blatantly violated the procedures outlined in Rule 23(a), the appropriate remedy is two-fold. First, this Court should issue a published opinion—before ruling on the habeas merits—

---

2019). But the justification proffered to this Court was insufficient. The Warden contended that the transfer was "to facilitate movement between institutions"—i.e., to "open a bed at that prison for someone else to participate" in a work program. Response, No. 19-5340, Doc.14-1 at 1-2. The Warden did not represent that LLCC was at full capacity, that another inmate slotted to take that bed was eligible to participate in the work programs at LLCC, or that the work programs were otherwise not available at other facilities. The Warden has also failed to explain whether there were other inmates at LLCC—ones without pending habeas petitions under review—who do not participate in the work programs or whether the Kentucky Department of Corrections considered transferring those inmates ahead of Miles.

admonishing the Warden for the "deliberate disregard" of this Court's rules and thereby putting other wardens on notice that such behavior is impermissible. *See Schultz v. United States*, 373 F.2d 524 (5th Cir. 1967) (admonishing custodian for "deliberate disregard" of appellate rules prohibiting transfer of habeas petitioner). Second, the published opinion should explain that district courts retain jurisdiction pending appellate review to authorize transfers and substitutions of custodians, as well as authority to enter sanctions for the flagrant indifference to compliance with the federal courts' procedural rules. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (recognizing judicial "implied powers" include the "power to impose . . . submission to their lawful mandates" (internal quotation marks omitted)).

Ultimately, it is incumbent upon this Court to take necessary action to ensure that its rules and orders are followed. And declining to remedy the Warden's violation here only encourages future lapses and undermines the rule of law.

## CONCLUSION

This Court should reverse the district court's judgment and instruct the district court to grant Miles's habeas petition. Alternatively, it should vacate the district court's judgment and remand for the district court to review Miles's claims in light of the full state-court record, including ordering the Warden to furnish all relevant pre- and post-trial motions related to Miles's speedy trial claim.

Respectfully submitted,

/s/ Kathryn Kimball Mizelle
Louis K. Fisher
Kathryn Kimball Mizelle
    *Counsel of Record*
Genna L. Sinel
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3435
kmizelle@jonesday.com

*Counsel for Appellant*
    *Terrance Miles*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,573 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Cir. R. 32(b)(1), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Times New Roman style, 14 point font.

June 8, 2020                              <u>/s/ Kathryn Kimball Mizelle</u>
                                         Kathryn Kimball Mizelle

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 8, 2020, I electronically filed the original of the foregoing brief with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

<u>/s/ Kathryn Kimball Mizelle</u>
Kathryn Kimball Mizelle

## DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

| Docket Entry No. | Description | Page ID # Range |
|---|---|---|
| 1 | Petition for Writ of Habeas Corpus | 1-29 |
| 1-2 | Memorandum in Support of Petition | 86-123 |
| 1-3 | Miles Letter to court dated November 25, 2005 | 125-126 |
| 1-3 | Miles Letter to court dated March 6, 2006 | 127 |
| 1-3 | Miles Letter to court dated May 22, 2006 | 128 |
| 1-3 | Reclassification Custody Forms | 129-130 |
| 1-3 | Prison Psychiatrist Prescriptions | 132-134 |
| 1-3 | Death Certificate of Steven Edwards | 135 |
| 1-3 | Newspaper Article about Edwards death | 136 |
| 1-3 | Affidavit of Miles | 137-138 |
| 7 | Order Directing Warden to Answer Petition and File State-Court Record | 213-214 |
| 16 | Rule 5 Answer to Petition | 234-272 |
| 16-2 | Index to Appendix of Rule 5 Answer | 274-275 |
| 16-2 | Indictment | 276-278 |
| 16-2 | Amended Judgment on Jury Trial, 05-cr-740 | 280-282 |
| 16-2 | Brief for Appellant, 2007-SC-298-MR | 283-308 |
| 16-2 | Brief for Commonwealth, 2007-SC-298-MR | 309-347 |
| 16-2 | Reply Brief, 2007-SC-298-MR | 348-354 |
| 16-2 | Memorandum Opinion of the Kentucky Supreme Court Affirming, 2007-SC-298-MR, January 22, 2009 | 355-368 |
| 16-2 | Motion to Vacate Pursuant to Rule 11.42 | 369-373 |
| 16-2 | Memorandum of Law and Facts in Support of Movant's Rule 11.42 Motion | 374-414 |
| 16-2 | Commonwealth's Response to Movant's Rule 11.42 Motion | 426-448 |
| 16-3 | Order on Rule 11.42, Jefferson Circuit Court | 449-456 |
| 16-3 | Second Order on Rule 11.42, Jefferson Circuit Court | 457-458 |
| 16-3 | Opinion Reversing and Remanding, Kentucky Court of Appeals, 2012-CA-1240 | 528-546 |
| 16-4 | Memorandum Opinion of the Kentucky Supreme Court Reversing, 2014-SC-558-DG & 2015-SC-321-DG, August 24, 2017 | 737-749 |

| 17 | Notice of Conventional Filing by Commonwealth (2 DVDs) | 750-751 |
| 18 | Receipt of Conventional Exhibits Filed by Commonwealth (1 CD) | 752 |
| 21-1 | Receipt of Conventional Exhibits Filed by Miles (2 VHS tapes; 1 CD) | 794 |
| 31 | Motion for Production of State Court Records | 1016-1018 |
| 32 | Response to Motion to Produce State Court Records | 1019-1020 |
| 36 | Order, Granting Motion to Substitute Warden | 1028 |
| 52 | Notice of Conventional Filing of Substitute Video by Commonwealth | 1075 |
| 53-1 | Receipt of Non-Electronic Document Filed by Commonwealth (1 DVD) | 1077 |
| 54 | Order, Denying Motion for Production of State Court Records | 1078-1085 |
| 56 | Magistrate Judge Findings of Fact, Conclusions of Law and Recommendation | 1088-1144 |
| 65 | Order Adopting Magistrate Recommendation | 1241 |
| 66 | Judgment Denying Habeas Petition and Granting COA | 1242 |
| 70 | Notice of Appeal | 1260 |
| 77 | Sixth Circuit Order | 1271-1281 |