**CASE NO. 19-5340**

_____

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

TERRANCE MILES                                    APPELLANT

v.

SCOTT JORDAN, WARDEN                              APPELLEE

_____

Appeal from the United States District Court for the
Western District of Kentucky at Louisville
No. 3:14-CV-00558-JHM-RSE

_____

**BRIEF FOR APPELLEE SCOTT JORDAN, WARDEN**

_____

**DANIEL CAMERON**
Attorney General of Kentucky

**JAMES C. SHACKELFORD**
Assistant Attorney General
Office of Solicitor General
Criminal Appeals Unit
1024 Capital Center Drive
Frankfort, Kentucky 40601
Phone: 502-696-5342
Fax: 502-696-5533
jim.shackelford@ky.gov

Counsel for Appellee

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... iii

STATEMENT REGARDING ORAL ARGUMENT .......................... vi

STATEMENT OF THE ISSUES ................................................1

INTRODUCTION .................................................................2

STATEMENT OF THE CASE....................................................3

    **I.**    **State proceedings**..................................................3

    **II.**   **District Court proceedings**..................................19

SUMMARY OF ARGUMENT....................................................26

    **I.**    **Speedy trial claims**.............................................27

    **II.**   **The IAC claims**..................................................28

    **III.**  **Miles's transfer during pendency of the appeal**............29

STANDARD OF REVIEW ......................................................30

    **I.**    **Standard under 28 U.S.C. § 2254** .........................30

    **II.**   **The *Strickland* standard and double deference**..............33

ARGUMENT .....................................................................34

    **I.**    **The Kentucky Supreme Court did not unreasonably apply controlling federal law regarding Miles's speedy trial claim**..................34

i

**II.    The Kentucky Supreme Court did not unreasonably apply controlling federal law when it determined counsel was not ineffective**........................44

**III.    There was no violation of FRAP 23(a) because this Court retained jurisdiction of this appeal.**..................52

**CONCLUSION**...........................................................58

**CERTIFICATE OF COMPLIANCE**........................................60

**CERTIFICATE OF SERVICE**.................................................60

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Jabe*, 933 F.2d 1007 (6th Cir. 1991) ........................................ 29, 55

*Barden v. Keohane*, 921 F.2d 476 (3rd Cir. 1990) ..................................... 56

*Barker v. Wingo,* 407 U.S. 514 (1972) .................................................. passim

*Brown v. Bobby*, 656 F.3d 325 (6th Cir. 2011) ...................................... 32,37

*Burt v. Titlow*, 571 U.S. 12 (2013) .................................................. 33

*Carey v. Musladin*, 549 U.S. 70 (2006) ......................................... 32

*Carter v. Bogan*, 900 F.3d 754 (6th Cir. 2018) .............................. 33

*Cohen v. United States*, 593 F.2d 766 (6th Cir. 1979) ......................... 29,55

*Commonwealth v. Miles (Miles III)*, 2014-SC-000558-DG,
 2017 WL 5504212 (Ky. Mar. 23, 2017) ............................................ passim

*Cullen v. Pinholster*, 563 U.S. 170 (2011) .............................. 31,43

*Dalton v. Battaglia*, 402 F.3d 729 (7th Cir. 2005) ...................... 58

*Doggett v. United States*, 505 U.S. 647 (1992) ................................. passim

*Early v. Packer*, 537 U.S. 3 (2002) ................................................ 32

*Estelle v. McGuire*, 502 U.S. 62 (1991) ....................................... 52

*Farmer v. Commonwealth*, 583 F.3d 131 (2d Cir. 2009) .................. passim

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*,
 307 F.3d 501(6th Cir. 2002) ............................................................ 30

*Goodman v. Keohane*, 663 F.2d 1044 (11th Cir. 1981) ...............................57

*Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415 (6th Cir. 2003)................30

*Hakeem v. Beyer*, 990 F.2d 750 (3d Cir. 1993)...........................................22

*Hammer v. Meachum*, 691 F.2d 958 (10th Cir. 1982) ...............................57

*Harrington v. Richter*, 562 U.S. 86 (2011)............................................. 32,34

*Harris v. Commonwealth*, 384 S.W.3d 117 (Ky. 2012)........................ 18, 51

*Hill v. Masters*, 836 F.3d 591(6th Cir. 2016) ........................................ 29, 55

*Jago v. U.S. Dist. Ct., Northern Div of Ohio, E. Div.at Clev.*,
   570 F.2d 618 (6th Cir. 1978)..........................................................54

*Major v. Commonwealth,* 177 S.W.3d 700 (Ky. 2005). .............................51

*Miles v. Commonwealth (Miles I)*, 2007-SC-000298-MR,
   2009 WL 160435 (Ky. Jan. 22, 2009) .................................. passim

*Miles v. Commonwealth* (*Miles II*), 2012-CA-001240-MR,
   (Ky. App. Aug. 22, 2014)...........................................................16

*Moorish Science Temple of America, Inc. v. Smith*,
   693 F.2d 987 (2nd Cir. 1982).................................................. 30, 56

*Rayner v. Mills*, 685 F.3d 631 (6th Cir. 2012) ...........................................34

*Rice v. Collins*, 546 U.S. 333 (2006).............................................................33

*Sears v. Upton*, 561 U.S. 945 (2010) ..........................................................49

*Shabazz v. Carroll,* 814 F.2d 1321(9th Cir. 1987), *vacated in*
   *part on other grounds in* 833 F.2d 149 (9th Cir. 1987).............................56

*State v. Saunders*, 491 N.E.2d 313 (Ohio App. 1984) ..............................40

*Thomas v. Stephenson*, 898 F.3d 693 (6th Cir. 2018)...................................52

*United States v. Dreitzler*, 577 F.2d 539 (9th Cir. 1978)...........................39

*United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009)...............................46

*United States v. Robinson*, 455 F.3d 602 (6th Cir. 2006) ..........................42

*White v. Woodall*, 572 U.S. 415 (2014) .......................................................32

*Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006) ..................................49

*Williams v. Taylor*, 529 U.S. 362 (2000) ............................................... 31, 35

*Williams. White v. Woodall*, 572 U.S. 415 (2014) ......................................32

*Ylst v. Nunnemaker*, 501 U.S. 797 (1991) ...................................................48

## Federal Statutes/Rules

28 U.S.C. § 2254(d)(1) .......................................................................passim

FRAP 23(a) ..........................................................................................passim

FRAP 43(c)(2)..............................................................................................58

## State Statutes/Rules

RCr 11.42 .....................................................................................................15

# STATEMENT REGARDING ORAL ARGUMENT

Appellee Scott Jordan does not request oral argument.

## STATEMENT OF THE ISSUES

1.    Whether the Kentucky Supreme Court unreasonably applied controlling Supreme Court precedent when it determined there was no violation of Appellant's right to a speedy trial where most of the delay was due to the wait for "crucial" DNA test results.

2.    Whether the Kentucky Supreme Court unreasonably applied *Strickland v. Washington,* 466 U.S. 668 (1984), when it determined there was no *Strickland* prejudice where the prosecutor briefly referred to Appellant's nicknames during closing argument.

3.    Whether the Kentucky Supreme Court unreasonably applied *Strickland* when it determined there was no *Strickland* prejudice for failing to object to trial testimony that a gun was found at Appellant's residence and the jury was repeatedly told the gun was unconnected with the crime.

4.    Whether the Warden's admitted transfer of Appellant to another facility violated Fed. R. App. Proc. 23(a) and the ramifications of any violation.

# INTRODUCTION

Michael Teasley, a bouncer at a nightclub, ejected Appellant Terrance Miles from the club and pummeled him in the process. The prosecution theorized Miles waited outside for Teasley to appear and then shot Teasley for revenge. Witnesses had described Miles wearing a black toboggan while in the club and one was found outside. Both the prosecutor and defense thought the results of DNA testing could be "crucial" and the toboggan was sent for testing nine months after Miles was charged. Miles, who was in prison on another conviction, was convicted of Teasley's murder 21 months after being charged. In rejecting a speedy trial claim on direct appeal, the Kentucky Supreme Court identified and applied analysis for such claims in *Barker v. Wingo,* 407 U.S. 514 (1972). It ultimately concluded there was no speedy trial violation. *Miles v. Commonwealth (Miles I)*, 2007-SC-000298-MR, 2009 WL 160435, at *3 (Ky. Jan. 22, 2009).

The Kentucky Supreme Court later rejected Miles's two ineffective assistance of counsel (IAC) claims now before this Court. In applying *Strickland v. Washington,* 466 U.S. 668 (1984), the state court determined that brief references to Miles's nickname "Old Gangster" during closing argument was not prejudicial in the context of the whole trial. *Commonwealth v. Miles (Miles*

*III)*, 2014-SC-000558-DG, 2017 WL 5504212 at *2 (Ky. Mar. 23, 2017). The court also determined there was no prejudice when counsel failed to object to testimony about a gun being found at Miles's residence because the jury was informed multiple times the gun was unrelated to Teasley's murder. *Id.* at *3.

The District Court dismissed all of the claims, but granted a certificate of appealability on all three of the above claims, R.66, PID# 1242, and one that counsel has since abandoned. Brief for Appellant, p. 2 n. 1. This Court then asked the parties to address the transfer of Miles from one prison to another without prior judicial approval required by Fed. R. App. Proc. (FRAP) 23(a).

## STATEMENT OF THE CASE

### I.    State proceedings.

*A. Trial and Direct Appeal.*

Miles was ejected from Club 502 and then got into a fight with Michael Teasley, a bouncer at the club. Crystal Teasley, the victim's wife also worked at the club and testified at trial that "Miles grinned and said to her husband, 'you might have whipped my ass, but I'm going to get you.'" *Miles I,* 2009

3

WL 160435 at *1. Teasely was shot and killed later that night as he was help-ing clear the parking lot when the club closed. Frank Hill, an off-duty police officer, worked security and testified he did not see the shooting but looked when he heard gunshots and saw a man in dark clothing and wearing a to-boggan running away. Hill testified the man was the same one he saw fighting with Teasley earlier. *Id.*[1] Police found a black toboggan and a cell phone in the area where the man was seen fleeing. Analysts were ultimately unable to match Miles's DNA to the hat. *Miles I,* 2009 WL 160435 at *1; R.16-2, PID# 356.

The number from the cell phone, however, matched the one Miles gave a car rental agency the next day when he switched rental cars. *Id.* An em-ployee at the car rental agency testified Miles rented a black Pontiac Grand Prix on February 21, 2005, and exchanged it for a white Toyota Camry the morning of Monday, February 28, 2005, the day after Teasley was killed. R.53-1; Appendix to Miles's Brief (MA1, 310-311). Miles did not return the

---

[1] On direct, Hill identified the man running as the one he saw fighting with Teasley earlier. R.53-1; Appendix to Miles's Brief (MA1) at 157. On cross, Hill simply said the man fit the same description. *Id.* at MA1 179-180. On redirect, Hill confirmed it was the same man. *Id.* at MA1 196-197.

Camry to the rental agency, but the agency recovered it after calling a contact Miles had given the agency. *Id.* at 314.

Miles was charged March 5, 2005. *Miles I,* 2009 WL 160435 at *1. The hat was not sent to a lab for DNA testing until November 7, 2005. *Id.* at *2. Miles asked for a speedy trial in a pro se letter to the trial court on November 25, 2005. *Id.*[2] However, trial counsel did not object when a trial continuance was discussed at a pretrial hearing on December 5, 2005. *Id.* At that hearing, counsel asked the trial court to remand the pro se motion and Miles himself agreed. MA1 16. The prosecutor said the DNA results were not back yet and they could either be exculpatory or inculpatory. In addition, forensic testing of a gun seized from Miles's residence was still incomplete. *Miles I,* 2009 WL 160435 at *2; MA1 9-10. Trial counsel said he anticipated a delay because there was a backlog in testing. MA1 11.

---

[2] Miles asked the magistrate judge to order the Warden to produce *everything* in the state record, contrary to the express provisions of Rule 5 of the Rules Governing Habeas Proceedings. R.31, PID# 1016. If Miles believed the Warden missed something specifically, he failed to bring this to the attention of the Warden or the magistrate judge. Instead, Appellant asked for "the entire original state court records, or a certified copy thereof, which includes the written Trial Transcript of Records, Video or Tape Recordings of Appellant's trial, sentencing and evidentiary hearings, that is located in the Office of the Jefferson Circuit Court, under Indictment No. 05-CR-000740, and all the appellate Briefs and opinions, as required by 28 § 2254 Cases 5(c)…."*Id.* As the district court determined, the Warden's production was "comprehensive and responsive to the claims in Miles' petition," R.54, PID# 1084-1085.

The prosecutor formally moved for a continuance on December 13, 2005, the day of the scheduled trial. Trial counsel did not object but filed a formal speedy trial motion the same day. *Miles I,* 2009 WL 160435 at *2; MA1 16-17. In a pretrial hearing March 3, 2006, Miles acknowledged the hat was a "crucial piece of evidence" when the prosecutor informed the trial court the lab had not yet started processing the hat. *Miles I*, 2009 WL 160435 at *2. Even though test results were not back, Miles objected to further delays at hearings on April 11, 2006, and September 26, 2006. *Id.* Miles's trial began December 12, 2006. *Miles I,* 2009 WL 160435 at *2.

There was never an issue during the trial that Teasley and Miles fought when Teasley ejected Miles from the club. In addition to prosecution witnesses such as Officer Frank Hill and Crystal Teasley, defense witness Vernon Douglas testified that he saw Miles that night laughing about being tossed out of the club. MA1 493.

Trial counsel accordingly adopted a strategy that minimized the importance of Miles's ejection and any role it played in providing a motive to kill Teasley. Counsel anticipated witnesses from the club would refer to

Miles by "Cat Daddy"[3] and told the jury in opening statement that Miles was known to many at the club by that nickname. MA1 125. At the same time, counsel pushed a narrative that the club catered to an "unsavory" clientele, intimating one of the other customers may have killed Teasley. He told the jury in opening statement about Miles's ejection and that the club routinely ejected patrons. Counsel told the jury that the clientele of the club included "gangsters," "gangbangers," "dope dealers," "dope users," and "street punks." MA1 129-130. Defense witness Vernon Douglas confirmed this when he testified. MA1 433. Counsel also elicited testimony from Vernon Douglas that Miles had previously been ejected from that club and that both he and Miles sometimes got ejected from clubs. MA1 439.

Trial counsel also used the lack of any DNA match from the toboggan to his advantage. In opening he told the jury that when Frank Hill saw a man running, he simply saw a toboggan and a man dressed in black. This caused the police to become fixated on Miles as the perpetrator during the investigation, but there was ultimately never any match to Miles's DNA. MA1 136-

---

[3] Counsel successfully moved *in limine* to prevent hearsay testimony to the effect they heard others say that "Cat Daddy" did it." R.53-1, MA1 134.

137. Counsel also told the jury Raymond Douglas saw the shooter and it was not Miles. *Id.* at 138. Raymond Douglas testified consistently with counsel's statement. MA1 468-469.

Detective Ashby, the lead detective, testified that another detective told him the hat was found covered with leaves and mud. Ashby said he had never even looked at the hat during the investigation, only a photo of it, and he thought the hat was irrelevant to the crime. He sent the hat for DNA testing only because the prosecutor asked him to do so. MA1 337-338. Defense counsel attacked the investigation and the state's case when he argued in closing that the state had thought the hat important because it sent it to be tested, but then thought it was unimportant when there was no DNA match. Counsel told the jury the toboggan was important even though the prosecution had tried to distance itself from the hat. MA1 518. Counsel also argued that police did not interview a potential witness because they thought "we've got the guy and the DNA's going to come back and we're going to match the match. And this is going to be game, set, match. The DNA comes back. It doesn't match." MA1 527-528.

Similarly, the jury heard there was no forensics match of fired bullets to a gun found at Miles's residence. On direct examination, Detective Ashby

testified the gun found at Miles's residence had been sent for testing but it was not used to shoot Teasley. MA1 350-351. Indeed, the prosecutor had explained this to the jury in opening statement. MA1 124.  On cross-examination of Ashby, defense counsel asked the detective if the gun had "anything, anything to do with this case" and Ashby agreed it did not. MA1 385. On redirect, the prosecutor once again had the detective explain that the gun had not been used in the shooting. Police had seized it and photographed it because they originally thought it might be important before it was tested. MA1 388. Defense counsel did not object to this testimony but did successfully object to introducing a photo of the gun as an exhibit. MA1 351-352.

Defense counsel used the non-match of the gun to the crime and again attacked the prosecution's case during closing argument. Trial counsel referred to statements made by the prosecutor during opening about the seizure of clothing and a gun. "[P]ants were found. A gun was found. A shirt was found. And that the conclusion is, they got—they've identified this—they're going to tie in this evidence to—never tied in the fact the gun was

conceded—completely unrelated. Completely unrelated to the case. Completely unrelated." MA1 504. In his subsequent closing argument to the jury, the prosecutor avoided the gun issue and never mentioned it.[4] MA1 535-554.

The prosecutor did refer to Miles's nicknames "Cat Daddy" and "Old Gangster" during closing argument. He mentioned both nicknames in conjunction with each other four times and the name "Cat Daddy" by itself two times. MA1 537, 539, 542, 552-554. The prosecutor referred to the names to show state of mind and motive for revenge. For example:

> Okay. What's his state of mind? He's known as Cat Daddy there. He's known by Old Gangsta. But that night was different. He was publicly humiliated. His motive was revenge. Okay. And that is a powerful motive, especially when his faculties are depressed by the drugs that he's on. He's not going to be able to control himself like he would if he was clear-headed like any of us. He's high. He's drunk. He's going to do what he wants to do.

MA1 539.

In the end, the jury convicted Miles of murder, first-degree wanton endangerment, tampering with physical evidence, and being a second-degree

---

[4] In Kentucky state courts, the defense gives its closing argument first, followed by the prosecutor's closing argument. There is no rebuttal. Ky.R.Crim.Proc. 9.42(f).

persistent felony offender. Miles was sentenced to a total of 50 years imprisonment. *Miles I*, 2009 WL 160435 at *1.

> B.    *Direct Appeal*

The Kentucky Supreme Court affirmed Miles's conviction and sentence on direct appeal in *Miles I*. In its opinion, the court addressed the speedy trial claim now before this Court, but the state court first addressed a preliminary motion that is relevant to that issue.

> 1.    The Kentucky Supreme Court did not allow Miles to supplement the record on appeal with an affidavit Miles signed after he was convicted.

After the record on appeal was certified to the Kentucky Supreme Court, Miles moved to supplement the record on appeal or hold the appeal in abeyance. Appendix of Appellee Jordan (JA2) at 562-568 (6th Cir. Dkt N. 40; pages numbered consecutively with those from Miles's Appendix 1). Miles tendered two documents with his motion: (1) Miles's own affidavit dated May 7, 2007, stating "James Steven Edwards" told Miles he saw someone else shoot Michael Teasley, JA2 566-567, and (2) a copy of a death certificate stating that "Steven James Edwards" died June 25, 2006. JA 568. The Commonwealth objected because: (1) the documents had never been part of

11

the state trial court record and (2) the jury found Miles guilty December 6, 2006, but the affidavit was not signed until May 7, 2007, after the date of trial. JA 569-573. The Kentucky Supreme Court denied the motion to supplement on September 21, 2007. JA574. Based on these documents, the Warden requested that the Court take judicial notice that Miles moved to supplement the record on appeal with the affidavit and death certificate, that the Commonwealth opposed it, and that the Kentucky Supreme Court denied the motion. Motion to Take Judicial Notice and File Appendix, 6th Cir. DN 39 (pending at the time this brief was filed).

In its opinion affirming Miles's conviction and sentence, the Kentucky Supreme Court began its review by noting the record showed there was a 21-month delay from indictment to trial and that there were three continuances granted the Commonwealth due to the delayed DNA analysis. It also noted trial counsel did not object to the first continuance when the parties discussed it at a pretrial hearing December 5, 2005, but then filed a formal speedy trial motion on December 13, 2005. Trial counsel also objected to two subsequent continuances granted the Commonwealth because DNA testing had not been completed on the toboggan. *Miles I*, 2009 WL 160435 at *2.

2.    The Kentucky Supreme Court found no speedy trial violation.

The Kentucky Supreme recognized that *Barker v. Wingo,* 407 U.S. 514 (1972), was controlling precedent on the issue of speedy trials and first determined the delay in this case was presumptively prejudicial, but was not determinative. *Miles I*, 2009 WL 160435 at *2. It then noted the four-factor analysis set out in that case: "1) length of the delay; 2) reason for the delay; 3) defendant's assertion of his right to a speedy trial; and 4) prejudice to the defendant." *Id.* at *2 (citing *Barker* 407 U.S. at 530).

In looking at the reasons for the delay, the state court noted the prosecutor's assertions that DNA testing on the toboggan hat was vital and that during the delay, the prosecutor was in contact with the lab. The court noted defense counsel had told the trial court that the results were "crucial" and that the defense did not object to testing. The defense only wanted to have their own expert present for testing. *Id.* at *2-*3.

Miles argued that the prosecutor acted in bad faith because the lead detective testified at trial that he thought the hat was irrelevant and that the prosecutor downplayed the significance of the hat at trial after arguing it was vital during pretrial proceedings. *Id.* at *3. The Kentucky Supreme Court rejected the bad faith argument and concluded that when no DNA match

13

was found, the prosecutor "had no choice but to minimize the evidentiary value of the hat at trial." *Id.*

As to the third *Barker* factor, the Kentucky Supreme Court acknowledged Miles had asserted his speedy trial right, both pro se and through counsel, while also recognizing counsel did not initially object to a continuance. *Id.* at *3. The court then turned to the fourth factor, prejudice to Miles.

In assessing prejudice, the court first looked at Miles's assertion in his brief that a key witness, Steven Edwards, died June 25, 2006.[5] But the court found that Miles never subpoenaed Edwards to trial. And it also determined that the only references to Edwards at the trial court level were a mention of Edwards "as an alias for Miles" and a March 2007 motion to dismiss for a speedy trial violation. *Id.* That motion was filed months after Miles's trial (and after the death of the purported witness). Looking at what was in the state record, the court said: "Further, *Miles does not allege what Edwards' testimony would have been and why he was so crucial to his case*." *Id.* (emphasis added).

---

[5] The assertion in Miles's state brief is at R.16-2, PID# 292. It also mentions the proffered affidavit which the Kentucky Supreme Court refused to allow Miles to file. *Id.* at n. 1.

Moreover, the court also recognized that the lack of a DNA match from the hat to Miles was favorable to the defense: "The negative DNA results on the hat were a large part of Miles' defense and were repeatedly referred to by defense counsel at trial as proof that Miles was not the shooter." *Id.*

After weighing all of the factors, the Kentucky Supreme Court concluded Miles's right to a speedy trial right was not violated. *Id.* The court denied the other issues raised on direct appeal and affirmed Miles's conviction. *Id.* at *7.

C.    *State post-conviction proceedings.*

1.    Proceedings in the lower courts.

Following the denial of his direct appeal, Miles then filed a *pro se* motion to alter, amend or vacate his convictions pursuant to Kentucky Rules of Criminal Procedure (RCr) 11.42. PID# 369-425. He asserted numerous IAC claims, two of which are before this Court. He claimed counsel was ineffective for failing to object to the prosecutor's reference to Miles's nicknames and for failing to object to testimony about the gun found in Miles's residence that was unrelated to the crime.  Miles procured private counsel to assist him at the evidentiary hearing that was held in multiple parts. The trial

court denied all of Miles's claims. Order at R.16-3, PID# 449-456; Amended Order at R.16-3, PID# 457-458.

Miles appealed to the Kentucky Court of Appeals and it ordered the conviction to be reversed. *Miles v. Commonwealth* (*Miles II*), 2012-CA-001240-MR, slip op. at 15 (Ky. App. Aug. 22, 2014)[6]; R.16-3, PID# 528-545. The panel rested its decision on cumulative error by combining prejudice on three of the IAC claims: counsel's failure to object to the use of a nickname, failure to object to the mention of a gun, and failure to object to hearsay by one of the witnesses. *Id.* at PID# 542-544.

    2.    Reinstatement of the order denying post-conviction relief.

The Kentucky Supreme Court granted discretionary review, reversed the Court of Appeals opinion, and reinstated the trial court's order denying the post-conviction motion. *Miles III*, 2017 WL 5504212 at *1.  After rejecting each claim individually, the Kentucky Supreme Court rejected the intermediate appellate court's use of cumulative error. *Id.* at *5.

The Kentucky Supreme Court correctly identified *Strickland v. Washington,* 466 U.S. 668 (1984), as the clearly established law for IAC claims. *Miles*

---

[6] The opinion does not appear in WestLaw.

*III,* 2017 WL 5504212 at *2. It noted that Miles had to prove both deficient performance and prejudice and specifically quoted the standards from *Strickland*. *Id.*

In reviewing the IAC claim that counsel failed to object to the use of Miles's nickname, the court noted that trial counsel had discussed Miles's nickname "Cat Daddy" during opening statement. Then, when the prosecutor asked defense witness Vernon Douglas what Miles was called, he replied Miles was known as "O.G." or "Original Gangster." *Id.* at *3; MA1 449. The court then addressed the prosecution's use of Miles's nicknames "Old Gangster" and "Cat Daddy" in closing argument. *Id.* The court distinguished the facts in Miles's case with those in the case upon which Miles relied—*United States v. Farmer*, 583 F.3d 131, 146 (2nd Cir. 2009). The court contrasted the limited use of Miles's nickname "Old Gangster" compared to *Farmer,* where the defendant was charged with murder and the prosecutor had used Farmer's nickname "Murder" 30 time as a "a rhetorical trope." *Miles III,* 2017 WL 5504212 at *3 (citing *Farmer* at 146).

The Kentucky Supreme Court concluded that Miles had failed to show the use of his nicknames prejudiced him "in any way." *Id.* The court further stated: "These comments, in the context of an entire trial, were de minimis"

17

and any claims of prejudice were "speculative." *Id.* Finding no prejudice, the court did not decide if counsel performed deficiently. *Id.*

The court similarly found no prejudice in counsel's initial failure to object to the mention of a gun found at Miles's residence and similarly declined to address the performance prong of *Strickland*. *Id.* at *5. The court first recounted that the prosecutor told the jury in opening statement that police found a gun under a mattress at Miles's residence but that the gun was unrelated to the murder. *Id.* at *4. In addition, the lead detective testified about finding the gun and it was not connected to the crime. *Id.* Although not objecting to these statements or a picture of the gun being flashed on a projector, trial counsel did object when the prosecution sought to admit the photo of the gun into evidence. *Id.*

In reviewing whether references to the gun were prejudicial, the court observed that it had previously found no prejudice where several guns unrelated to the crime had been admitted into evidence, but the jury was informed they were unconnected to the crime. *Id.* (citing *Harris v. Commonwealth*, 384 S.W.3d 117, 125 (Ky. 2012)). The court noted the fact the jury in Miles's case was repeatedly told the gun was not connected to the crime. *Id.* at *4. Moreover, the gun itself had not been admitted into evidence, "a fact

that further dampens Miles's claim of prejudice." *Id.* Finding no *Strickland* prejudice, the court reinstated the trial court's order denying post-conviction relief. *Id.* at *6.

## II. District Court proceedings.

Miles filed his habeas petition in district court, raising the speedy trial claim and ten claims of IAC. Findings of Fact, Conclusions of Law, and Recommendation (Report), R.56, PID# 1091-1144. The magistrate judge recommended all claims be denied but with a certificate of appealability on four claims. Those include the speedy trial issue and the claims of (IAC) related to Miles's nicknames and the gun. Miles has chosen to abandon the fourth claim upon which a COA was issued, an IAC claim for failure to object to hearsay. Brief for Appellant, p. 2 n.1. The district judge adopted the report of the magistrate judge in its entirety and dismissed the petition. R.1241.

### A.  *The speedy trial claim.*

In addressing the speedy trial claim, the district court first independently reviewed the facts to determine whether it thought there had been a speedy trial violation under *Barker* and *Doggett v. United States*, 505 U.S. 647, 652 (1992). Report, R.56, PID# 1111. Like the state courts, the district

court determined the 21-month delay between indictment and trial was presumptively prejudicial and triggered a look at the remaining *Barker* factors. *Id.*

In looking at the second *Barker* factor, reason for the delay, the district court noted that the sole reason given for the delay was DNA testing on the hat and the prosecution's representations at pretrial hearings (on March 3, 2006, April 11, 2006, and September 26, 2006) that the lab had not finished DNA testing. *Id.* The court rejected Miles's argument that the prosecution acted in bad faith when it first asserted to the trial court that the DNA results from the hat were critical, but then downplayed the lack of a match to the jury at trial. *Id.* at 1112-1113. In doing so, the district court also factored in defense counsel's representation to the state trial court that the DNA results would be crucial, whether inculpatory or exculpatory. *Id.* at 1113.

After noting the delay actually hindered the prosecution's case, the district court noted that the initial delay in sending the hat for testing was due to a difference of opinion between the lead investigator and the prosecution:

> When the prosecution questioned Detective Ashby
> on direct examination about locating and testing the

> hat, Detective Ashby stated that he sent the hat off for testing because the Commonwealth asked him to, not because he thought it was used in the crime. (DN 17, Trial Tape 1, 12-13-06, 12:52:38-12:55:00). This testimony reveals that the prosecution and law enforcement disagreed as to the potential relevancy of the hat to the crime but does not demonstrate that the Commonwealth committed misconduct by requesting the hat be tested.

*Id.* at 1113-1114.

The district court concluded the reason for delay weighed more in the Commonwealth's favor because the "reason for the delay was valid and neutral and does not appear to be motivated by bad faith, as Miles alleges." *Id.* at 1114 (internal punctuation omitted).

The third *Barker* factor, whether the defendant asserted his speedy trial right, weighed in Miles's favor. R.56, PID# 1114. The district court noted Miles's pro se letter to the trial court on November 25, 2005, trial counsel's speedy trial motion the next month, and Miles's objection to a trial continuance during an April 11, 2006 pretrial conference. R.56, PID# 1114. However, the district court also referred to the Kentucky Supreme Court's finding that

defense counsel had not initially objected to the state's request for a continuance. *Id.* Like the state court, the district court weighed the third *Barker* factor in Miles's favor. *Id.*

As to the fourth factor in assessing speedy trial violations, the district court rejected Miles's assertion that he suffered all three kinds of prejudice mentioned in *Barker* and *Doggett*: oppressive pretrial detention, anxiety, and impairment of his defense. *Id.* at 1114-1115. Miles was already in prison, but claimed the pending murder indictment adversely affected him because it caused him to be housed in a more secure facility and prevented participation in certain rehabilitation programs. The court recognized these depravations could be prejudicial. *Id.* (citations omitted). Yet, the court said Miles "fails to demonstrate that had he not been indicted in this case that he would have qualified for the rehabilitation privileges, such as entry into a halfway house, that he presently asserts." R.56-1115-1116.

The court was likewise not persuaded by Miles's claims of anxiety and concern about the outcome of the litigation. The court said that anxiety that is "inevitable in a criminal case" is insufficient. *Id.* at 1116 (citing *Hakeem v. Beyer*, 990 F.2d 750, 762 (3d Cir. 1993)). Here, Miles's allegations were vague and his allegations of increased anxiety were insufficient to show anxiety

beyond that which inevitably results from a criminal case. *Id.* Therefore, the court concluded Miles did not suffer from this type of prejudice. *Id.*

The district court also found no prejudice to Miles's case due to the delay. As it played out, the delay helped Miles: "The evidence of the toboggan hat ended up being detrimental to the prosecution's case and, if anything, made proving its case beyond a reasonable doubt more difficult." *Id.* at 1113.

Turning to what it called the "crux" of Miles's prejudice argument, the court found that the death of Steven Edwards in June of 2006 did not prejudice Miles's defense. *Id.* at 1116-1117. It noted the Kentucky Supreme Court's finding that no subpoenas were issued for Edwards before any of the trial dates and that the only mentions of Edwards in the record were in a motion to dismiss for a speedy trial violation in March of 2007 and as an alias for Miles himself. *Id.* 1116. It also found Miles never attempted to preserve the testimony of Edwards in any way and that Miles never told the Kentucky Court of Appeals what Edwards testimony would have been. *Id.* at 1117.

Miles attached his *own* March 7, 2007 affidavit to the petition saying Edwards told him that Edwards saw somebody else shoot Teasley. *Id.* But this was the same affidavit the Kentucky Supreme Court refused to be made

part of the record on appeal in *Miles I*. *Compare* affidavit at R.1-3, PageID#137 to JA2 566-567. The district court ultimately concluded Miles failed to show actual prejudice because of Edwards' death. *Id.* at 1117.

After engaging in what was essentially its own, independent analysis of the four *Barker* factors, the district court concluded: "[T]he Court cannot find the Kentucky Supreme Court's denial of Miles' speedy trial claim was an unreasonable application of clearly established federal law." *Id.*

   B.   *The IAC claim that counsel did not object to the use of nicknames.*

The district court rejected Miles's claim that counsel was ineffective for not objecting to the prosecutor referring to Miles's nicknames "Cat Daddy" and "Original Gangster" or "Old Gangster." After noting the nickname "Old Gangster" came up during cross-examination of a defense witness, the court recounted the prosecution's use of the nicknames during closing argument. It listed references to "Cat Daddy" both by itself and in conjunction with "Old Gangster." *Id.* at 1121.

Like the Kentucky Supreme Court, the district court contrasted the sparse use of Miles's nickname "Old Gangster" in Miles's trial to that in *Farmer v. Commonwealth*, 583 F.3d 131, 146 (2d Cir. 2009), where the Second Circuit found the use of the nickname "Murder" 30 times as a rhetorical

trope to be too prejudicial. R.56, 1121-1122. The district court determined the use of "Old Gangster" or "Original Gangster" had less prejudicial impact than the use of the nickname "Murder" in *Farmer* because the defendant in that case was on trial for murder. It noted there was no "criminal connotation associated with the nickname 'Cat Daddy'" and then concluded that the Kentucky Supreme Court did not unreasonably apply *Strickland* when it found there was no *Strickland* prejudice due to "the *de minimis* effect in the context of the entire trial." *Id.* at 1124 (citation omitted). The court did not address whether counsel's performance was deficient.

      C.    *The IAC claim that counsel failed to object to the mention of a gun.*

The court also determined the Kentucky Supreme Court did not unreasonably apply *Strickland* when it found there was no prejudice because of counsel's initial failure to object to references to a gun found at Miles's residence. *Id.* at 1127. The court noted: (1) the prosecutor referred to the gun during opening, while also telling the jury the gun was unrelated to the crime; (2) the prosecutor also referred to the gun during the testimony of the lead detective while showing the jury a photo of it; and (3) counsel successfully objected when the Commonwealth moved to introduce the photo of the gun. *Id.* at 1125.

The district court pointed to factors the Kentucky Supreme Court used to assess *Strickland* prejudice due to counsel's failure to object to the irrelevant gun: (1) the lead detective's testimony the gun was unconnected to the crime; (2) that the jury was repeatedly informed the gun was not related to the murder; and (3) the gun itself was not admitted into evidence. *Id.* at 11126 (citation omitted). The district court then determined: "The Kentucky Supreme Court's well-reasoned determination that Miles has not shown any cognizable prejudice is on par with the applicable principles of *Strickland* and its progeny and is grounded in a reasonable determination of the facts." *Id.* at 1127.

## SUMMARY OF ARGUMENT

Miles has failed to meet the high threshold required under the deferential standards of 28 U.S.C. § 2254 on his speedy trial claim and his IAC claims. Miles has not shown the Kentucky Supreme Court unreasonably applied controlling federal law; nor has he identified any Supreme Court case decided differently with materially indistinguishable facts from those before this Court.

## I.    Speedy trial claims.

In assessing Miles's speedy trial claim, the Kentucky Supreme Court recognized *Barker v. Wingo,* 407 U.S. 514 (1972), as controlling federal law. It found the 21-month delay between indictment and trial as being presumptively prejudicial, which triggered further review by applying the four-factor analysis set out in *Barker*. *Miles I*, 2009 WL 160435, at *2-*3. Miles argues the state court erred in the determination of two of the factors, reason for delay and prejudice. Brief for Appellant, p. 14, PID# 20. He has, however, offered no case reaching a different result on materially indistinguishable facts.

Although the Kentucky Supreme considered Miles's assertion of his right to a speedy trial, it also noted Miles did not object to the first continuance granted the Commonwealth while waiting for DNA test results on a hat found at the scene. It also considered the fact that Miles told the trial court the results were "crucial." *Miles I,* 2009 WL 160435 at *3.

The Kentucky Supreme Court also rejected Miles's claim he suffered prejudice due to the death of a purported favorable witness because no subpoenas had been issued for that witness on the scheduled trial dates. *Id.* This included the trial scheduled April 6, 2006 when Miles announced ready for trial. *Id.*; MA1 22. Critically, Miles never identified to the Kentucky Supreme

27

Court any specific prejudice due to Edwards's death: "Miles does not allege what Edwards' testimony would have been and why he was so crucial to his case." *Miles I,* 2009 WL 160435 at *3.

## II.    The IAC claims.

The Kentucky Supreme Court also rejected both IAC claims before this Court. It correctly identified *Strickland* as the controlling federal precedent. As contemplated by *Strickland*, the state court found it easier to address each claim solely on the prejudice prong of *Strickland* without determining if counsel had performed deficiently. For each claim, the court found there was no reasonable probability the result of the trial would have differed absent the claimed error.

The Kentucky Supreme Court said the limited use of Miles's nickname "Old Gangster" in a 30-minute closing argument did not constitute *Strickland* prejudice. Miles has not identified any federal controlling precedent on materially indistinguishable facts that was decided differently. Miles has failed to meet the "doubly" deferential standards of both *Strickland* and 28 U.S.C. § 2254. Miles also failed to meet those high standards on his claim counsel was ineffective for not objecting to mention of an unrelated gun found at his

28

residence. The Kentucky Supreme Court found the jury was repeatedly told the gun had no connection with the crime. *Miles III*, 2017 WL 5504212 at *4.

### III.   Miles's transfer during pendency of the appeal.

Finally, the Court directed the parties to brief the issue of Miles being transferred after he appealed his case without first seeking district court approval for the transfer as required by FRAP23(a). Miles was transferred from one state prison located in the Western District of Kentucky to another state prison located in the Eastern District of Kentucky. The rule was adopted to prevent attempts to divest the federal circuit courts of jurisdiction when a case is appealed. *See Cohen v. United States*, 593 F.2d 766, 767, n. 2 (6th Cir. 1979). That is *not* what happened here.

Under circumstances similar to those here, this Court and other Circuit Courts of Appeal have simply said the appellate courts retain jurisdiction and have declined to order the prisoner returned to the first prison because of lack of prejudice. *E.g.*, *Hill v. Masters*, 836 F.3d 591, 593 n. 2 (6th Cir. 2016) (noting a motion panel held that the Court did not lose jurisdiction due to an unauthorized transfer from a prison in the Eastern District Court of Kentucky to one in West Virginia); *Acosta v. Jabe*, 933 F.2d 1007, 2 (6th Cir. 1991) (table decision, without reported opinion) (court did not lose jurisdiction

and prisoner not ordered to be transferred back); *Moorish Science Temple of America, Inc. v. Smith*, 693 F.2d 987, 988 n. 2 (2nd Cir. 1982) (same). The Warden cites additional cases in the argument below. At worst, if Miles wins, the Court can simply substitute the name of the warden at his current prison.

## STANDARD OF REVIEW

This Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error. *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 418 (6th Cir. 2003). A finding on good or bad faith, such as whether the prosecutor acted in bad faith in delaying the trial, is a factual finding. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 523 n. 18 (6th Cir. 2002). The Court would be exercising its independent authority on the claim that FRAP 23(a) was violated.

### I.    Standard under 28 U.S.C. § 2254

The state courts reviewed all of the habeas claims now before the Court on the merits. Therefore, the Court reviews those claims under the deferential standards of 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act (AEDPA). AEDPA prohibits federal courts from granting writs of habeas corpus on claims previously adjudicated on the merits in state court

with two exceptions: by unreasonably applying clearly established Supreme Court precedent and by making an unreasonable factual determination based upon the evidence presented in state court.

A federal habeas court can grant the petition if the state decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court…"28 U.S.C. § 2254(d)(1). However, review under this section "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

In reviewing a state court decision, the federal habeas court must first determine whether there was a controlling rule prescribed by the Supreme Court and then decide whether the state court legal determination was an objectively unreasonable application of that rule. *Williams v. Taylor*, 529 U.S. 362, 402-413 (2000). The federal habeas court must determine the governing legal standard by referring to holdings, not *dicta*, of the Supreme Court which control a state court decision. *Id*. at 403-413. For a state to have acted contrary to clearly established precedent, the Supreme Court must have decided a case differently which has "materially indistinguishable facts" than the state case. *Id*. at 413.

31

In addition, a state court decision is not contrary to Supreme Court precedent simply because it does not specifically cite Supreme Court cases or is unaware of the controlling case. *Early v. Packer*, 537 U.S. 3, 8 (2002). Indeed, the state court does not even have to be aware of the controlling Supreme Court precedent so long as neither the reasoning nor the result of the state court decision contradicts that precedent. *Id.* at 8; *see also Brown v. Bobby*, 656 F.3d 325, 331 (6th Cir. 2011) (failure of state court to explicitly address the four *Barker* factors in assessing a speedy trial claim does not mean its determination was contrary to Supreme Court precedent).

Moreover, a federal habeas court cannot extend Supreme Court precedent beyond the limits set out in *Williams*. *White v. Woodall*, 572 U.S. 415, 426 (2014) (federal habeas court improperly combined holdings from three Supreme Court decisions). In addition, circuit precedent cannot be considered in determining what constitutes clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 127 (2006).

The AEDPA standard was intended to be "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). A writ should issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Id.* at 101.

A federal court can also grant a petition if the state determination "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, it is not enough that "a federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013). Or, as noted by this Court: "[T]he record must '*compel* the conclusion that the state court had no permissible alternative' but to arrive at the contrary conclusion." *Carter v. Bogan*, 900 F.3d 754, 768 (6th Cir. 2018) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).

## II.    The *Strickland* standard and double deference.

Miles makes two IAC claims. The clearly established precedent for these claims is *Strickland v. Washington*, 466 U.S. 668 (1984). The party claiming IAC bears the burden of showing that (1) counsel's performance was deficient in that it fell outside the range of professionally competent assistance and (2) such deficiency was prejudicial which a petitioner demonstrates by showing there exists a reasonable probability the outcome would have been different if not for counsel's deficient performance. *Id*. at 687.

This Court should give both *Strickland* deference and AEDPA deference in reviewing the two IAC claims. The Supreme Court has emphasized,

33

"The standards created by *Strickland* and § 2254(d) are both highly deferential … and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105. The "pivotal question" in a § 2254 proceeding "is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101 (citations omitted).

The Kentucky Supreme Court did not decide the performance prong of *Strickland*. Any review by this Court of counsel's performance would be *de novo. Rayner v. Mills*, 685 F.3d 631, 637 (6th Cir. 2012).

## ARGUMENT

### I.    The Kentucky Supreme Court did not unreasonably apply controlling federal law regarding Miles's speedy trial claim.

After the Court in *Barker* identified the four factors to weigh in determining whether there has been a speedy trial violation, 407 U.S. at 530, it found the delay of more than five years to be "extraordinary," with only seven months of it attributable to a strong reason—the illness of an important witness for the government. *Id.* at 533-534.

The Kentucky Supreme Court recognized the 21-month delay between indictment and trial as being presumptively prejudicial and then analyzed

all four factors set out in *Barker* before finding there was no speedy trial violation. *Miles I*, 2009 WL 160435 at *2-*3.

Tacitly recognizing the folly of challenging the state court's opinion through the lens of AEDPA deference, Miles asks this Court to review the speedy trial claim *de novo* because the state court "applied a legal standard contrary to clearly established federal law…." Brief for Appellant, p. 22, PID# 29. That assertion is incorrect, but even if true, the test is whether the *result* is contrary to clearly established Supreme Court precedent. *Packer*, 537 U.S. at 8; *Brown*, 656 F.3d at 331. Miles has not identified any Supreme Court opinion that decided a speedy trial issue differently than the Kentucky Supreme Court did involving "materially indistinguishable facts." He has therefore failed to show the state court acted contrary to clearly established federal precedent. *Williams*, 529 U.S. at 413 (2000).

Miles pins his hope of *de novo* review on the argument that the state court applied the wrong legal standard on the second and fourth *Barker* factors (reason for delay and prejudice) and did not "determine what weight to assign each factor." Brief for Miles, p.25, PID# 32. Contrary to Miles's implication, a reviewing court need only consider each factor in conjunction with the others. There is no Supreme Court precedent that requires a reviewing

court to assign weight percentages to each factor or to each individual fact it considers. And, under AEDPA, it is the state court result that matters.

Because Miles presents arguments on only two of the Barker factors, the Warden likewise focuses its discussion on those two factors.

A.    *The Kentucky Supreme Court properly considered and weighed the reasons for the delay.*

Miles argues the state court never asked "whether the government or the criminal defendant is more to blame." Brief for Appellant, PID# 32 (citing *Doggett*, 505 U.S. at 651). This is incorrect because the Kentucky Supreme Court analyzed the "reason for the delay." *Miles I*, 2009 WL 160435 at *2-*3. In *Barker*, the Court recognized that "some might express [the four factors] in different ways" and identified one of those as "the reason for the delay." 407 U.S. at 530. Indeed, the Supreme Court later expressed it differently. It described the phrase "the reason for the delay" as "whether the government or the criminal defendant is more to blame" for the delay. *Doggett,* 505 U.S. at 651 (citing *Barker* 407 U.S. at 530). But, however expressed, it is the same factor; a factor the Kentucky Supreme Court correctly expressed and analyzed.

36

Sometimes a "more neutral reason such as negligence or overcrowded dockets" is weighed less heavily against the government than a deliberate attempt to hamper the defense. *Barker*, 407 U.S. at 531. The Court said that sometimes delay may be fully justified by the reason for the delay, such as locating a missing witness. *Id.* at 530. Similar to the missing witness scenario, the delay in this case was largely attributable to the need to wait for crucial DNA test results.

In assessing the reason for delay, the Kentucky Supreme Court pointed to the prosecutor's assertions that DNA testing on the toboggan hat found near the scene was vital. *Miles I*, 2009 WL 160435 at *2-*3. Indeed, even the defense agreed that the results were crucial and did not object to testing; the defense wanted only to have their own expert present for testing. *Id.* In *Brown v. Bobby*, this Court said a state court decision finding no speedy trial violation was not unreasonable when the state court attributed most of the wait on DNA test results to the defendant, who had never requested the test, but stood to gain from it if there was no match. 656 F.3d at 333–334. In that case, at least 11 months of the delay from the defendant's arrest in July 2001 to his second scheduled trial date in June 2002 was due to requests by the

prosecution, requests necessary because of delays in receiving DNA test re-
sults. *Id.* at 327-328. Here too, Miles stood to gain from the test results if there
was no match to his DNA. The Kentucky Supreme Court noted Miles had
termed the results "crucial," *Miles I,* 2009 WL 160435 at *2-*3, and the district
court concluded the lack of a match made the prosecution's case more diffi-
cult to prove. R.56, PID# 1113.

A deliberate attempt to hamper the defense weighs more heavily
against the government than negligence on part of the government. *Barker,*
407 U.S. at 531. Here the Kentucky Supreme Court made a factual finding
that *none* of the delay was attributable to bad faith of the prosecutor. *Miles I,*
2009 WL 160435 at *3. The court said both sides had recognized the im-
portance of the test results and the prosecution had to minimize the eviden-
tiary value of the hat to the jury when no DNA match was made to Miles. *Id.*
Moreover, the lead investigator explained at trial that the initial delay in
sending the hat for DNA testing was due to a difference of opinion between
him and the prosecutor about the potential evidentiary value of the hat. *Id.*
The district court also independently concluded there was no bad faith on
behalf of the government. R.56, PID# 1112-1113.

Moreover, little or no weight should be attributed to the first nine months between indictment and the first scheduled trial date. Although the hat was not submitted for testing until the end of this period, Miles failed to object to the first continuance at a December 5, 2005 pretrial hearing. *Miles I,* 2009 WL 160435 at *2. At the same hearing, counsel asked the trial court to remand his client's pro se motion for a speedy trial and Miles personally agreed. MA1 16.

In *Barker*, the Court indicated a defendant's failure to object to continuances can be a consideration against finding a speedy trial violation. 407 U.S. at 536. The Court said the record suggested that Barker "hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges…." *Id.* at 535. Miles wanted to use the DNA test results to aid in his defense and did not object to the first continuance that came nine months after the indictment. The Kentucky Supreme Court rightfully considered Miles's assertion to the trial court that the DNA results were "crucial." Some courts have gone even further. *United States v. Dreitzler*, 577 F.2d 539, 550 (9th Cir. 1978) (attorney who, in effect, agrees to a later trial date while asserting his client's statutory speedy trial right cannot later argue violation of that right); *State v. Saunders*, 491 N.E.2d 313, 315–16 (Ohio

App. 1984) (counsel's agreement to continuance waived speedy trial right). Thus, the Kentucky Supreme Court's decision to weigh the delay less harshly than Miles posits is not unreasonable.

> B. *The Kentucky Supreme Court did not unreasonably apply controlling federal precedent when it found there was no prejudice to Miles's defense.*

Miles also argues the Kentucky Supreme Court reached a determination "contrary to clearly established federal law" on the fourth Barker factor—prejudice to the defendant. Brief for Appellant , p. 27, PID# 34 (citing *Doggett,* 505 U.S. 647 at 655). The Kentucky Supreme Court initially determined that the delay was presumptively prejudicial, triggering its analysis of the four *Barker* factors, including particularized prejudice. *Miles I*, 2009 WL 160435 at *2. Miles, however, suggests the state court should have eschewed an analysis of particularized prejudice and should have simply decided the delay created an irrebuttable presumption of prejudice constituting a speedy trial violation. Brief for Appellant, p. 27, PID# 34. Yet, Miles has pointed to no clearly established Supreme Court case on materially indistinguishable facts that compels this approach.

In *Barker*, the Supreme Court held there was no speedy trial violation despite a delay of more than five years from indictment to conviction. 407

40

U.S. at 536. Barker was indicted in September of 1958 and the state sought and received a total of 16 continuances in an effort to first convict a co-defendant and eliminate the co-defendant's right not to testify at Barker's trial. *Id.* at 516. Barker spent ten months in jail before being released on bail. He sought to dismiss the indictment in February of 1962 and then both objected to a continuance sought of a March 1962 trial date and moved to dismiss for violation of his right to a speedy trial. After obtaining the testimony of Barker's co-defendant following the co-defendant's sixth trial, the state finally convicted Barker in October of 1963. *Id.* at 516-517. Thus, a delay of over five years was insufficient, by itself, to trigger a speedy trial violation. Nor was the 17-month delay between Barker's motion to dismiss in March 1962 until the trial in October 1963 sufficient to trigger a speedy trial violation. Here, excluding the initial nine month delay, which Miles waived, the delay was only 12 months.

The Supreme Court dealt with extraordinary circumstances in *Doggett v. United States*, 505 U.S. 647 (1992). The Court said an eight-and-a-half-year delay between indictment and trial caused mostly by the government's negligence was sufficiently long by itself to violate the defendant's speedy trial

violation without a showing of prejudice. *Id.* at 657-658. Indeed, the government had done next to nothing to find or arrest the defendant for at least six years. And Doggett had become a model citizen during that period. *Id.* at 649-650. But the delay in this case does not come anywhere close to that in *Doggett* and, as discussed above, Miles waived nine months of the delay and the rest can be attributed to "neutral" reasons, rather than government negligence.

In the absence of specific and substantial trial prejudice, any delay must be "shockingly long" to find prejudice sufficient to violate one's speedy trial right. *United States v. Robinson*, 455 F.3d 602, 608 (6th Cir. 2006) (citations omitted) (finding a delay between May 2002 and April 2004 insufficient to violate the defendant's right to a speedy trial). This Court determined on direct review that the pendency of federal charges rendering the defendant "ineligible for certain placements and programs in the state prison… was not the type of prejudice cognizable under the Sixth Amendment." *Id.* at 609 (citations omitted). In this case, the Kentucky Supreme Court had already considered the inherent prejudice one might suffer as a result of simply being charged when it found the delay to be long enough to consider the four

*Barker* factors. The district court concluded that Miles, who was already serving time in prison, had failed to show "that had he not been indicted in this case that he would have qualified for the rehabilitation privileges, such as entry into a halfway house, that he presently asserts." R.56-1115-1116.

Miles argues he was prejudiced because a witness favorable to him, Steven Edwards, died before trial. As previously argued, however, *that evidence was never in the state record on appeal*. Accordingly, the Kentucky Supreme Court stated: "Miles does not allege what Edwards' testimony would have been and why he was so crucial to his case." *Miles I,* 2009 WL 160435 at *3. Since this is a proceeding under 28 U.S.C. § 2254(d)(1), review by federal courts is limited to the state court record. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). Thus, this Court should not consider Miles's post-conviction affidavit about the expected testimony of Edwards. And, as previously set out, the Kentucky Supreme Court affirmatively refused to allow Miles to supplement the record on appeal with his self-serving affidavit. *Supra* at 11-12.

The Kentucky Supreme Court could not find any mention of "Edwards" in the trial record except as an alias used by Miles himself and a March 2007 motion (after Miles was convicted). *Miles I*, 2009 WL 160435 at *3. It also found nothing in the record showing subpoenas had been issued

for Edwards for the two scheduled trial dates that were continued. *Id.* Miles attempts to brush this latter fact under the rug by suggesting trial counsel knew the trial would be continued. Brief for Appellant, pp. 34-35, PID# 41-42. Trial counsel, however, *announced ready on April 6, 2006, the day the re-scheduled trial was supposed to start*. MA1 22.

Finally, the delay actually benefitted Miles: "[T]e negative test results on the hat were favorable to Miles' case at trial. The negative DNA results on the hat were a large part of Miles' defense and were repeatedly referred to by defense counsel at trial as proof that Miles was not the shooter." *Miles I,* 2009 WL 160435 at *3.

Miles has failed to show there is no possibility that fairminded jurists could reach the same conclusion as the Kentucky Supreme Court. The Court should therefore deny this claim.

## II.    The Kentucky Supreme Court did not unreasonably apply controlling federal law when it determined counsel was not ineffective.

There are two IAC claims before the Court. The first is Miles's claim that trial counsel did not object to the mention of his nicknames "Cat Daddy" and "Old Gangster." The second is that trial counsel failed to object to the

44

mention of a gun found at Miles's residence that was unrelated to the murder. In both instances, the Kentucky Supreme Court determined there was no *Strickland* prejudice and rejected the claims. *Miles III*, 2017 WL 5504212 at *3-4.

 A. *There is no possibility that fairminded jurists could fail to reach the same conclusion the Kentucky Supreme Court did when it held that the limited use of Miles's nicknames did not prejudice him.*

As previously summarized, trial counsel believed witnesses from the club would refer to Miles by "Cat Daddy "and told the jury in opening statement that Miles was known to many at the club simply as "Cat Daddy." Counsel also pointed to other patrons of the club as potential suspects by explaining the club catered to an unsavory clientele which included "gangsters" and "gangbangers." The club routinely ejected patrons and counsel downplayed any revenge motive by pointing out Miles had previously been ejected from the club. *See supra* at 6-7. Unanticipated by either party, a defense witness testified Miles was known as "OG" for "Original Gangster" or "Old Gangster." *Miles III* 2017 WL 5504212 at *3.

In this context, the limited mention of Miles's nicknames during closing argument did not prejudice Miles. The Kentucky Supreme Court rejected the comparison the state's intermediate appellate court made to *United States*

*v. Farmer*, 583 F.3d 131 (2d Cir. 2009). *Miles III*, 2017 WL 5504212 at *3. In that case, the defendant, nicknamed "Murder," was on trial for murder and attempted murder. The court said the "main problem" was "the prosecutors' frequently repeated, gratuitous invocation of Farmer's nickname" to the jury that implied he had earned the nickname because of his "proclivity to commit murder."*Farmer,* 583 F.3d 131 at 146-147. This included use of the nickname 30 times in a short rebuttal summation. *Id.* at 147. The court in *Farmer* contrasted decisions where use of a defendant's nickname was "occasional" or "brief and isolated" to the those before it where the use of the nickname "Murder" was "the main rhetorical trope used by the prosecution to address the jury" and where the prosecutors used the nickname at least 30 times in a brief rebuttal summation. *Id.*

The Kentucky Supreme Court distinguished the cases: "Miles's facts are distinct from those in *Farmer*. Miles's nickname was used a total of three times after it was first mentioned in the testimony of a defense witness. The present case is a far cry from the "rhetorical trope" in *Farmer*." *Miles III,* 2017 WL 5504212 at *3 (Ky. Mar. 23, 2017). Miles counts 10 uses of his nickname during the 30-minute closing argument. Brief for Appellant, p. 42, PID# 49.

However, six of those were the use of the name "Cat Daddy" — the one everybody at the club knew Miles by and the one defense counsel introduced in opening statement. It is not derogatory and does not have any criminal connotation. The prosecutor referred to "Cat Daddy" alone twice. MA1 542, 553. Four times he referred to "Cat Daddy" and "old Gangster" together. MA1 537, 539, 552, 554. The state court obviously focused on the "Old Gangster" nickname because appellate counsel had cited the *Farmer* opinion. And, if the state court missed one instance of the use of "Old Gangster," the facts were still "a far cry from the 'rhetorical trope' in *Farmer*." *Miles III,* 2017 WL 5504212 at *3. Moreover, *Farmer* is not a Supreme Court case and is not controlling federal law.

The Kentucky Supreme Court concluded Miles failed to show the prosecutor's brief remarks "prejudiced his case in any way." *Miles III,* 2017 WL 5504212 at *3. Instead, the "comments, in the context of an entire trial, were *de minimis*. Believing the reference to Miles's nickname somehow would have changed the course of his verdict is speculative." *Id.* Thus, the Kentucky Supreme Court *did* look at the entire trial when considering this issue, despite Miles's argument to the contrary. Brief for Appellant, p. 42, PID# 49. Petitioner also cherry picks portions of testimony from off-duty police officer

47

Frank Hill. On direct examination, Hill identified the man running as the one he saw fighting with Teasley earlier. MA1 at 157; R.53-1. On cross, Hill simply said the man fit the same description. MA1 179-180. On redirect, Hill confirmed it was the same man who fought the victim. MA1 196-197.

On direct appeal, the Kentucky Supreme Court called the evidence against Miles "overwhelming." *Miles I,* 2009 WL 160435 at *6. The weakness of Miles's argument is underscored by his reliance on comments about the weight of the evidence in the vacated opinion of the Kentucky Court of Appeals. Brief, p. 43, PID# 50. That opinion is not entitled to any consideration because this Court looks to the last reasoned opinion by the state courts. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Here, the last reasoned opinion was that of the Kentucky Supreme Court in *Miles III*. Moreover, the Kentucky Court of Appeals did *not* find *Strickland* prejudice on any individual claim. Instead, it applied the cumulative error doctrine to the two claims at issue plus a third not argued to this Court. *Miles II*, 2012-CA-001240-MR at 16-17; R. 16-3, PID# 270-271. The Kentucky Supreme Court, however, rejected use of the cumulative error rule. *Miles III*, 2017 WL 5504212 at *5. Similarly, this

Court has refused to consider cumulative error from IAC claims when reviewing habeas claims of state prisoners. *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).

Miles has not cited any controlling federal case on materially indistinguishable facts. He cites *Sears v. Upton*, 561 U.S. 945 (2010), but the facts are radically different than those here. The Court found counsel was ineffective in the sentencing phase of a death penalty case where counsel failed to present evidence of "significant mental and psychological impairments." *Id.* at 956 (internal punctuation omitted).

Miles has failed to surmount the high standard of deference given state court decisions under AEDPA. He has failed to show that fairminded jurists could not possibly reach the same conclusion as the Kentucky Supreme Court did. Thus, the Court should deny the claim.

> B.    *There is no possibility that fairminded jurists could fail to reach the same conclusion the Kentucky Supreme Court did when it held that the mention of a gun did not prejudice Miles.*

Petitioner argues counsel was ineffective for failing to object to testimony about a handgun found at his residence. Brief for Appellant, pp. 45-46, PID# 52-53.

The prosecutor noted in opening argument that the handgun discovered was not the one used in the murder. MA1 124, PID# 127. The prosecutor also elicited testimony from a police detective that the gun was unrelated to the crime because forensic testing failed to show a "match" between bullets found from that gun and the bullets that killed Teasley. MA1 350-352; PID# 353-354. Trial counsel successfully objected when the prosecutor moved to introduce a photo of the gun as an exhibit. MA1 351-352; PID# 354-355. Counsel then emphasized the lack of any connection of the gun to the crime by asking the detective if it had "anything, anything to do with this case?" and the detective reaffirmed it did not. MA1 385, PID# 388. Counsel also elicited testimony from the detective that police had never tested clothing found at Miles's apartment for gunshot residue. MA1 358-359; PID# 361-362.

Miles attacked the investigation and the state's case by arguing the gun was unconnected to the case, police never performed forensic testing on clothes they seized, and the prosecution never moved to admit into evidence a pair of black pants found in the apartment. MA1 504, PID# 507. And, of course, counsel emphasized the lack of any of Miles's DNA on the toboggan hat. MA1 518, PID# 521. In contrast, the prosecutor never mentioned the gun in closing argument. MA1 535-554, PID# 538-557.

The Kentucky Supreme Court found it unnecessary to determine the performance prong of *Strickland* and simply determined there was no *Strickland* prejudice. *Miles III*, 2017 WL 5504212 at *4. In doing so, it pointed to the repeated references the jury heard about the gun being unconnected to the crime and found any prejudicial impact was further dampened because the gun itself had not been admitted into evidence. *Id.* The court referred to another case where it had found harmless error on direct appeal where two guns unrelated to the crime charged had been admitted into evidence, but the jury was repeatedly made aware they were unconnected to the crime. *Id.* (citing *Harris v. Commonwealth*, 384 S.W.3d 117, 125 (Ky. 2012)).

Petitioner relies solely on the case of *Major v. Commonwealth* in which the state court reversed a cold-case murder conviction on direct appeal for improper admission of uncharged acts and improper admission of firearms unconnected to the crime. 177 S.W.3d 700, 706 (Ky. 2005). The facts are not similar to those in this case, with the most important difference being that there is no indication the jury in *Major* was aware the guns were unconnected to the crime charged. *Id.* at 710.

More fundamentally, the issue is not whether the Kentucky Supreme Court got state law wrong. "[F]ederal habeas corpus relief does not lie for

51

errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citations omitted); *accord Thomas v. Stephenson,* 898 F.3d 693, 700-701 (6th Cir. 2018). The issue was whether there was a reasonable probability the result of the trial would have been different if counsel had objected to testimony about the unrelated gun.

Miles has failed to show any controlling federal law which the Kentucky Supreme Court failed to follow or unreasonably failed to apply to materially indistinguishable facts. Fairminded jurists could conclude there was no reasonable probability the results of the trial would have been different absent testimony about the gun.

### III.    There was no violation of FRAP 23(a) because this Court retained jurisdiction of this appeal.

The Court directed the parties to brief Miles's motion pending before this Court in which he asks to be transferred from Eastern Kentucky Correctional Cowardmplex (EKCC) to Luther Luckett Correctional Complex (LLCC). Miles argues FRAP 23(a) was violated when he was transferred to a different prison after his appeal was docketed. When Miles filed his habeas petition in the District Court for the Western District of Kentucky, he was housed at LLCC, which is located in the Western District. After he appealed

the denial of his habeas petition, he was transferred to EKCC, which is located in the Eastern District of Kentucky. The transfer did not violate FRAP 23(a) because this Court retained jurisdiction despite the transfer. Nor, was there any intent to deprive the Court of jurisdiction.

FRAP 23(a) states:

> **Transfer of Custody Pending Review**. Pending review of a decision in a habeas corpus proceeding commenced before a court, justice, or judge of the United States for the release of a prisoner, the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule. When, upon application, a custodian shows the need for a transfer, the court, justice, or judge rendering the decision under review may authorize the transfer and substitute the successor custodian as a party.

The Warden did not ask any federal court permission to transfer Miles. There was no intent to violate the rule, however. Miles was transferred for reasons unrelated to his habeas petition as evidenced by a contemporaneous memo (dated July 10, 2019) by a deputy warden of LLC, 6th Cir. DN 14-2, and a transfer form, 6th Cir. DN 14-3. In the deputy warden's memo, she explains Miles was transferred "to facilitate movement between institutions" and "Inmate Miles was not participating in programming and did not

have a job assignment at LLCC." 6th Cir. DN 14-2. In other words, Miles was not participating in any work programs at LLCC and was therefore transferred in order to open a bed at that prison for someone else to participate.[7]

Dictum in *Jago v. U.S. Dist. Ct., Northern Div of Ohio, E. Div.at Clev.*, 570 F.2d 618 (6th Cir. 1978), suggests the district court retains jurisdiction to determine if FRAP(23) has been violated. This Court was faced with the issue of whether the district court retained jurisdiction to grant bail while its decision was on appeal to this Court. In upholding the district court's jurisdiction, the Court cited FRAP 23(a)[8] for the proposition that the district court retained jurisdiction to determine custody during an appeal and said nothing in Rule 23(a) implied "that any power to make that decision is lost or transferred to the appellate court because of the pendency of the appeal." *Id.*

---

[7] Miles had also complained in his motion about not having access to certain documents on a USB drive he left with a legal aid inmate at LLCC. This was almost immediately sent to Miles at EKCC and is no longer an issue.

[8] The rule at that time was almost identical to that today and stated:

> Pending review of a decision in a habeas corpus proceeding commenced before a court, justice or judge of the United States for the release of a prisoner, a person having custody of the prisoner shall not transfer custody to another unless such transfer is directed in accordance with the provisions of this rule. Upon application of a custodian showing a need therefore, the court, justice or judge rendering the decision may make an order authorizing transfer and providing for the substitution of the successor custodian as a party.

*Jago v. U.S. Dist. Ct.*, 570 F.2d at 626.

at 626 (citation omitted). That language is admittedly *dictum* because it was not strictly necessary to for Court's decision.

The Court also referred to FRAP 23(a) when reviewing a habeas decision where the petitioner claimed the government had welched on its plea bargain. *Cohen v. United States*, 593 F.2d 766 (6th Cir. 1979). The Court cited the rule to support its jurisdiction over the merits of the case. It simply noted that the prisoner had been assigned to a prison in the Eastern District of Kentucky when the petition was initiated and then transferred to a prison in Pennsylvania while the appeal was pending. *Id.* at 767, n. 2. The Court stated the rule required "an order of court before transfer," but did not divest the Court of jurisdiction to hear the appeal. *Id.*; *see also Hill v. Masters*, 836 F.3d 591, 593 n. 2 (6th Cir. 2016) (the Court noting a motion panel held the  Court did not lose jurisdiction due to an unauthorized transfer from a prison in the Eastern District Court of Kentucky to one in West Virginia); *Acosta v. Jabe*, 933 F.2d 1007, 2 (6th Cir. 1991) (unpublished) (citation omitted) (upon denying the prisoner's appeal, the Court denied the prisoner's request to be sent back to his former prison because the transfer did not divest the Court of jurisdiction).

Courts in other circuits have ruled that a transfer that does not divest the circuit court of jurisdiction does not violate FRAP 23(a). For example, the court in *Moorish Science Temple of America, Inc. v. Smith*, 693 F.2d 987, 988 n. 2 (2nd Cir. 1982), was faced with an identical fact pattern as that here. A state prisoner was transferred from one prison to another within the state. The court denied the prisoner's request to order a transfer back to the first state prison. The court noted that the purpose of the rule was to prevent prison officials from impeding a prisoner's habeas petition by transferring him outside the jurisdiction of the court. Since both the circuit court and the district court retained jurisdiction, the rule was not violated. *Id*. at 989 (citations omitted).

In *Shabazz v. Carroll,* the court said it retained jurisdiction despite a transfer from a prison in Arizona to one in Texas and that a transfer back to Arizona was unnecessary because there was no prejudice to petitioner. 814 F.2d 1321, 1324 (9th Cir. 1987), *vacated in part on other grounds in* 833 F.2d 149 (9th Cir. 1987); *see also Barden v. Keohane*, 921 F.2d 476 (3rd Cir. 1990) (prisoner transferred from prison in Pennsylvania to prison in Indiana did not deprive court of jurisdiction and the original warden remained the appropriate re-

spondent); *Hammer v. Meachum*, 691 F.2d 958, 961 n. 2 (10th Cir. 1982) (transfer did not deprive court of jurisdiction and motion to be transferred back was denied because there was no prejudice); *Goodman v. Keohane*, 663 F.2d 1044 (11th Cir. 1981) (transfer to prison in a different state did not deprive court of jurisdiction and there was no prejudice to the prisoner since habeas relief was denied).

There was no attempt to deprive this Court of jurisdiction in this case. Kentucky is fully within the Sixth Circuit so there is no question this Court has continuing jurisdiction of the appeal. Further, venue and jurisdiction of any district court proceedings remain in the Western District of Kentucky at Louisville, irrespective of where a prisoner is lodged within Kentucky. Joint Local Rule 3.2(b)[9] states: "A removal or state habeas corpus petition shall be assigned to the jury division that includes the court from which the removal is had or in which the challenged judgment, conviction or order was rendered." Miles was convicted of murder in Jefferson Circuit Court and Louisville lies inside Jefferson County. Moreover, Miles has pointed to no demonstrable prejudice because of the transfer.

---

[9] Joint Local Rules of Civil Procedure for the Eastern and Western Districts of Kentucky, governing habeas petitions filed under 28 U.S.C. § 2254.

There has been no violation of the rule because this Court was not divested of jurisdiction. Moreover, in the event the Court grants habeas relief of any type, it may simply substitute the Warden of EKCC, presently James David Green, for Warden Scott Jordan. *Dalton v. Battaglia*, 402 F.3d 729, 729 (7th Cir. 2005); FRAP 43(c)(2); FRAP 26(a).

## CONCLUSION

Miles has failed to show that the Kentucky Supreme Court unreasonably applied Supreme Court precedent on any of the three claims it decided and which are now before this Court. He has failed to show there is no possibility that fairminded jurists could possibly come to the conclusions the state court did. Therefore, this Court should affirm the district court's judgment dismissing the habeas petition with prejudice.

Since this Court was not deprived of jurisdiction and there was no prejudice to Miles, it should determine the transfer of Miles from one prison to another within Kentucky did not violate FRAP 23(a).

Respectfully submitted,

**DANIEL CAMERON**
Attorney General of Kentucky

s/ *James C. Shackelford*
**JAMES C. SHACKELFORD**
Assistant Attorney General
Kentucky Attorney General's Office
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, Kentucky 40601
(502) 696-5342
jim.shackelford@ky.gov
**Counsel for Appellee**

# CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(a)(7), I hereby certify the foregoing Brief for Appellant was typed using Book Antiqua, 14-point font, with a total word count of 12,503 excluding items set forth in FRAP 32(f) and 6 Cir. R. 32(b)(1). The word count was calculated by Microsoft Word.

s/James C. Shackelford
Assistant Attorney General

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Appellee on September 4, 2020 using the electronic case filing (ECF) procedure required by this Court, which will send notification of that filing to counsel for Appellant who is a registered user of the CM/ECF system.

s/James C. Shackelford
Assistant Attorney General

# RELEVANT DISTRICT COURT DOCUMENTS

| Description | Record Entry | Page Range |
|---|---|---|
| District Court Memorandum Opinion and Order | 50 | 1726-1741 |
| Report of Magistrate Judge | 39 | 1559-1618 |
| Amended Petition | 20 | 111-194 |
| Jury Instruction – Murder | 28-3 | 275-276 |
| Jury Instruction – Definitions | 28-3 | 285 |
| Verdict Form – Murder | 28-3 | 289 |
| Jury Instruction – Burglary 2nd (Murphy residence) | 28-3 | 283 |
| Jury Instruction – Burglary 1st and 2nd (Ziegler residence) | 28-3 | 281-282 |
| Agreed Sentence | 28-3 | 304-305 |
| Slip opinion; *Pollini v. Com. (Pollini I)*, 2003 SC-0552-MR (Oct. 13, 2005), published at 172 S.W.3d 418, 421 (Ky. 2005) | 28-3 | 626-649 |
| Slip opinion; *Pollini v. Com. (Pollini II)*, 2006-SC-000835-MR | 28-3 | 740-746 |
| Motion to Vacate Judgment | 28-3 | 330-385 |
| Opinion and Order (trial court) | 28-3 | 386-393 |

| Description | Record Entry | Page Range |
|---|---|---|
| Slip opinion; *Pollini v. Commonwealth (Pollini III)*, No. 2009–CA–000964–MR (Ky. App. July 16, 2010) (unpublished, vacated) | 28-3 | 855-872 |
| *Com. v. Pollini*, No. 201 0-SC-0504-D, Order (Ky. June 8, 2011) (unpublished), vacating *Pollini III* | 28-3 | 975 |
| *Pollini v. Com. (Pollini IV)*, No. 2009-CA-000964-MR (Ky. App. Dec. 22, 2011) (unpublished, vacated) | 28-3 | 907 |
| Slip opinion, *Com. v. Pollini (Pollini V)*, 2012-SC-000312-DG; published at 437 S.W.3d 144 (Ky. 2014) | 28-3 | 1297-1311 |